## UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| EMMA DOE, CARLA AND ROBERT DOE, individually, and as Parents and Guardians of their minor children, ANN DOE and OLIVER DOE, | } } } } | |
| Plaintiffs, | } } } | |
| v. | } } | |
| THE DISTRICT OF COLUMBIA, | } } | |
| MAYOR ADRIAN FENTY, | } } | |
| BRENDA DONALD WALKER, | } } | CASE No. 05-1060 (TFH) JURY DEMAND |
| SARAH MAXWELL, | } } | |
| SANDRA JACKSON, | } } | |
| HEATHER STOWE, | } } | |
| TERRI THOMPSON MALLET, | } } | |
| REBEKAH PHILIPPART, | } } | |
| and DAPHNE KING, | } } | |
| Defendants. | } } | |

## FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

### Jurisdiction and Venue

1.      This is a civil rights and tort action brought pursuant to the Constitution of the

United States, particularly the First, Fourth, Fifth, and Ninth Amendments; the laws of the

United States, particularly 42 U.S.C. §§ 1983, 1985 and 1988, and the laws of the District of

Columbia.    Temporary injunctive relief may be sought by the Plaintiffs in order to prevent perpetration of additional unlawful actions and to prevent further harm to fragile minor children.

2.    This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) and (b), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

3.    The events described herein predominately took place in Washington, D.C.; venue is therefore proper pursuant to 28 U.S.C. § 1391(b).

4.    Plaintiffs request a jury trial on all matters that can be decided by a jury.

### Parties

5.    Plaintiffs Robert and Carla Doe are adult residents of the District of Columbia. They are the legal parents and guardians of Emma Doe, Ann Doe and Oliver Doe.

6.    Plaintiffs Emma Doe (18 years old), Ann Doe (10 years old), and Oliver Doe (12 years old) are the children of Robert and Carla Doe. The actions of Defendant District and its employees in May 2007 forced Robert and Carla Doe to relinquish Wayne and Sara Doe ("the Twins") back to the custody of CFSA.   Thus, the Twins are no longer the minor children of Robert and Carla Doe and are no longer Plaintiffs in this action.

7.    Defendant District of Columbia ("Defendant District") is the government of the District of Columbia.  Defendant Adrian Fenty is the Mayor of Defendant District.  He is being sued in his official capacity.

8.    Defendant District's Child and Family Services Agency ("CFSA"), a cabinet-level agency of Defendant District, is charged to administer the child welfare support system and to ensure the safety and well being of the children residing within the District of Columbia. CFSA is subject to the ongoing jurisdiction of this Court pursuant to the terms of a Consent

*Amended Complaint - page 2*

Decree entered in a class action lawsuit brought by and on behalf of all children subject to the authority of CFSA. This Court has imposed stringent requirements on CFSA and Defendant District, including the establishment of CFSA as a cabinet-level agency of Defendant District. *See*, *LaShawn v. Williams*, Civil Action No. 89-1754 (D.D.C. 2000).

9.      Defendant Brenda Donald Walker was the Director of CFSA. Defendant Walker was charged with managing CFSA to ensure that the agency meets its obligations to the families and children in Defendant District who come under the agency's care. See, *e.g.*, D.C. Code § 4-1303.03. Defendant Walker was involved in decisions and actions taken that are the subject of this litigation. She is being sued in her individual capacity.

10.      Defendant Sarah Maxwell was a contractor or employee of Defendant District and served in upper management at CFSA as a Deputy Director. She is being sued in her individual capacity.

11.      Defendant Sandra Jackson is an employee of Defendant District and serves in upper management at CFSA. Defendant Jackson is believed to be the Administrator for Adoption and Foster Care. She is being sued in her individual and official capacities.

12.      Defendant Heather Stowe was an employee of Defendant District and served in upper management at CFSA. Defendant Stowe was the Administrator for Intakes and Investigations. She is being sued in her individual capacity.

13.      Defendant Terri Thompson Mallet at times relevant to this Complaint was an employee of Defendant District and General Counsel for CFSA. She is being sued in her individual capacity.

14.      Defendant Daphne King is an employee of Defendant District and serves as an

Investigative Social Worker at CFSA. She is being sued in her individual and official capacities.

15.     Defendant Rebekah Philippart is an employee of Defendant District and serves as an Investigative Social Worker at CFSA. She is being sued in her individual and official capacities.

### Facts Common to All Counts

16.     Robert and Carla Doe are adoptive parents. Four of their five children have been adopted from the foster care system in Defendant District. Robert and Carla Doe had also served for a number of years as licensed foster parents in Defendant District and in Colorado.

17.     Wayne and Sara came to the Doe Family in 2000 and their adoption was finalized in 2001. Wayne and Sara are twins and were nine years old when they joined the Doe family.

18.     Unbeknownst to the Does at the time of their adoption, the Twins had many serious emotional and psychological problems. While the family was generally aware that the Twins' birth mother had a drug abuse problem and that she had been neglectful, they were not aware of the extensive nature of the abuse and neglect the Twins suffered. For example, Robert and Carla Doe were led to believe that the Twins came into the custody of CFSA in October 1996. However, CFSA's records reveal that the Twins' birth family became known to the agency as early as June 1991.

19.     Coincidentally, about the time the Twins' birth family became known to CFSA, this Court rendered a decision about the state of Defendant District's foster care system. On April 18, 1991, this Court issued a ruling, following a lengthy trial, in the class action lawsuit that had been filed against Defendant District because of the awful state of its foster care system. *LaShawn A. v. Dixon*, 762 F. Supp. 959 (D.D.C. 1991).

*Amended Complaint - page 4*

20.    The *LaShawn* decision stated, in part, "[t]he Court has found that the DHS has, at least since 1987, consistently failed to comply with the requirements of the federal Adoption Assistance Act, the District's Abuse and Neglect Act, the CFSD Manual of Operations, and reasonable professional standards." *LaShawn A.*, 762 F.Supp. at 982 – 983.

21.    CFSA records (recently obtained) indicate that the Twins' birth mother was in contact with  CFSA[1] Intake Office and was placed at the TLC II Shelter at 1451 Chapin St., NW on June 3, 1991.  The record reveals that the Twins' birth mother abandoned the shelter on June 26, 1991.  At the time, the Twins were approximately five weeks old.

22.    On August 27, 1991, the *LaShawn A.* Court issued the first Remedial Order.

23.    When the Twins' birth mother sought assistance with housing again in February 1992, she was deemed ineligible because she abandoned the previous placement.

24.    A CFSA investigation of the Twins' and their birth mother during the period February 19, 1992 through March 16, 1992 discovered that the family had no home and no place to stay.  CFSA social worker Don Pilson noted in a report that "[t]hese children are apparently being dragged from pillar to post, and probably dropped with unwilling caretakers along the way."

25.    In a March 14, 1992 memo transferring the case, CFSA social worker Don Pilson summarized his thoughts on what he learned stating "35 year old mother of  9 month old twins, an apparently serious substance abuser, with no stable address."

26.    On April 24, 1992, the CFSA child abuse hotline received a call from Howard

---

[1] Before becoming a cabinet level agency, CFSA was a division of the Department of Human Services.  At that time, the agency was referred to as the Child and Family Services Division [CFSD].  For consistency, throughout this Complaint the agency will be referred to as CFSA.

University Hospital. The caller reported that Wayne's birth mother brought him to the hospital because he had ingested part of a mouse. The birth mother was threatening to leave the hospital against the doctor's advice. She was observed picking Wayne up by the arm in a manner that could cause a sprain. The notes on this call end with a request to "[p]lease look into this situation."

27.    CFSA records for the period June 1991 through May 1993 do not reveal that any safety assessment or risk assessment was done concerning the Twins.

28.    On May 28, 1993, following a self report from the Twins' birth mother that she and the children had a place to live and were doing fine, CFSA closed the case.

29.    On April 5, 1994, the Metropolitan Police Department [MPD] was called to remove the twins' birth mother from an apartment. She was reportedly drunk and hostile. The Twins were both placed in foster care.

30.    On April 15, 1994, following a home visit, CFSA returned the twins to their birth mother. CFSA records indicate that the birth mother was informed that a Protective Services case would be opened and that the family would be monitored. The report further notes that the birth mother stated that she understood and would be available.

31.    On October 4, 1994, the *LaShawn A.* Court ordered CFSA into limited receivership.

32.    On March 5, 1994, CFSA records reveal that an anonymous caller reported that the Twins were often dirty, begging for food and without adult supervision. The caller also stated that the birth mother was a drug or alcohol abuser. At the time, the Twins were not yet three years old.

*Amended Complaint - page 6*

33. CFSA records indicate that a social worker visited only one time, but did not confirm the allegations made in the call.

34. CFSA records indicate that despite the birth mother's commitment in April 1994 to be available to be contacted, CFSA was unaware of her whereabouts from September 1995 until October 29, 1996.

35. On May 22, 1995, the *LaShawn A.* Court ordered CFSA into full receivership because the agency failed to comply with the Remedial Order. *See*, *LaShawn A. v. Kelly*, 887 F.Supp. 297 (D.D.C. 1995).

36. On October 29, 1996, a family friend brought Wayne to the CFSA Intake Office. The friend reported that the birth mother was a drug abuser and that the Twins had been enrolled in school late, thirty days after school started. The friend also reported to CFSA that the birth mother rented a room in a known crack house. When the birth mother failed to pick Sara up from school, the twins were placed at St. Ann's Infant Home. At this time the twins were five years and five months old.

37. On November 4, 1996, CFSA social worker Yvonne Woodard went to the birth mother's address for a home visit. She noted "a lot of male and female traffic in and out of the home." Ms. Woodard met a young woman outside the house who claimed to be the birth mother's roommate and who "appeared to be under the influence of some type of substance."

38. On December 3, 1996, CFSA social worker Yvonne Woodard and supervisory social worker Ilia Rivera Sanchez prepared a transfer summary of the Twins' case. In the summary the social workers noted that the birth mother was unable to provide a safe and stable living environment for her children.

39.    On February 14, 1997, the Twins were placed in a foster home in Maryland. They remained in this foster home until they were adopted.

40.    The Twins were not psychologically or psychiatrically assessed prior to the foster placement.  The Twins were not interviewed regarding the details of their abuse and neglect.

41.    On March 3, 1997, the Methodist Board of Child Care ("BCC") assumed family responsibility for the Twins and their birth mother.  BCC is a licensed child placing agency and a contractor to CFSA.

42.    On May 19, 1997, and following an evidentiary hearing, the D.C. Superior Court determined that Wayne and Sara were neglected children.

43.    The Twins' birth mother underwent psychological and psychiatric testing and she was ordered to undergo drug testing.  On June 26, 1997, a psychological evaluation was performed and found that the birth mother could not adequately care for her children at that time. The psychiatric assessment diagnosed Dysthymic Disorder and Personality Disorder.

44.    During a July 2, 1997 supervised visit between the Twins and their birth mother, the social worker noted that the birth mother inappropriately tickled Wayne in "his genital area."

45.    In July 1997, a psychological assessment of Sara found that a psychosocial stressor for her was her early neglect and separation from her birth mother and her birth mother's alcohol and drug use.   An assessment of Wayne produced the same diagnoses.

46.    Efforts continued through 1997 and part of 1998 to reunify Wayne and Sara with their birth mother.  However, on May 4, 1998, the Twins' goal was changed from family reunification to adoption.

47.    In October 1998, the Twins' then-Guardian *Ad Litem* ("GAL") and her husband

filed a petition to adopt Wayne and Sara. However, the GAL noted that if the foster parents chose to adopt the children, that she would withdraw her adoption petition. A new GAL was appointed to represent the children.

48.    On November 17, 1998, after months of deliberation, the foster parents advised the new GAL that they wanted to adopt the twins.

49.    Despite stated intentions, neither the former GAL nor the foster family adopted the twins.

50.    In May 2000, Robert and Carla Doe family agreed to bring Wayne and Sara into their home as foster children with the intention of adopting them.

51.    Robert and Carla Doe filed an adoption petition in the D.C. Superior Court. The adoption was contested by the Twins' birth mother.

52.    The BCC prepared a pre-adoption report on March 21, 2000 that stated that both Wayne and Sara were educationally on target and that neither child had any foreseeable medical, developmental, or health concerns.

53.    The D.C. Superior Court approved the Twins' adoptions in July 2001.

54.    The Twins had difficulties in their new family almost from the start. Not knowing any of the facts recited above, Robert and Carla Doe attributed the Twins' behaviors to adjusting to a new family and parents. Consequently, Robert and Carla Doe and the Twins participated in attachment therapy for a period of six to eight months. The therapy was generally helpful but did not seem to break through the emotional barriers.

55.    During the period 2000 through 2003, the Does tried different therapists and approaches to help the Twins. None of these efforts seemed to make any significant difference

in the Twins' emotional or psychological conditions.

56.   In particular, Wayne's behavior worsened and he became difficult to manage and was not receptive to honest communication.  The family located a therapeutic summer program for Wayne and requested that CFSA pay for it.  After considerable struggle, CFSA agreed to pay for the camp.  Wayne spent six weeks in Summer 2003 at a camp designed for children with difficult emotional issues.

57.   Upon his return from camp, Wayne was better behaved for a short time.  Then as school began in 2003, Wayne's behavior deteriorated again.  He aggressively displayed anger, lied, and was stealing from his family.  Wayne's outbursts would often scare Oliver and Ann and made family life generally unpleasant.

58.   Sara also had difficulty.  It was clear that she was not attaching to her adoptive family and that she was lying, stealing, and generally deceptive.   However, Sara was more outwardly compliant so her problems did not seem as urgent as Wayne's.

59.   Wayne's issues severely disrupted the family, and it was decided that intensive therapeutic services were needed on an emergency basis.  Those services were obtained through Adoption Attachment Partners, a therapy group specializing in attachment disorders and relationship building.

60.   Robert and Carla Doe attended three consecutive several-hour-long sessions with Wayne.  The focus of these sessions was to aid Wayne in disclosing problems that were at the root of his terrible behavior.  Through these intensive sessions Wayne revealed that: (a) he witnessed the drive-by murder of a boy when he was about four or five years old; (b) he was terrified to discuss the murder because he believed he might also be murdered; and (c) while

living with his birth mother he was sexually abused by a woman he would not or could not identify.   These revelations, although tremendously painful, seemed to help Wayne and initially improved his behavior.

61.    Robert and Carla Doe then began having Sara attend therapy with the same therapist.

62.    Unfortunately, Wayne's behavior again spiraled out of control.    In early September 2004, the Does then placed him with his respite care provider who was experienced in helping children with attachment disorder and sexual abuse issues.

63.    Some time after placing Wayne in respite care, during the course of individual therapy, both Wayne and Sara revealed that they had had sexual contact with each other and with Oliver and Ann, the Does other adopted children.

64.    On September 27, 2004, Robert and Carla Doe hand-delivered a letter to then-CFSA Acting Director Brenda Donald Walker and CFSA Adoption Services Program Manager Sharon Knight.   Robert and Carla Doe sought emergency assistance because the Twins were causing serious family problems.

65.    Robert and Carla Doe explained in the letter that Wayne and Sara had presented emotional and behavioral issues since joining their family that had been difficult to address.  The Twins had seen different therapists, but little had helped.  In fact, Wayne's behavior had become so unmanageable at times that he had to be removed from the family to a therapeutic respite home recommended by his therapists.

66.    In addition to Wayne's anger issues, both Wayne and Sara had engaged in abnormal amounts of lying, stealing and other deceptive behaviors.

*Amended Complaint - page 11*

67.     Robert and Carla Doe further explained in the letter that the Twins' serious behavioral problems forced them to pursue intensive therapy for Wayne and later for Sara. While in therapy, Wayne and Sara revealed that their foster family physically and emotionally abused them and their birth mother and/or other adults horrendously sexually abused them. These facts were unknown to Robert and Carla Doe at the time they adopted Wayne and Sara, and were unknown until approximately September 2004.

68.     Robert and Carla Doe further explained in the letter that during recent therapy sessions Wayne and Sara revealed that they had been abusive to Robert and Carla Doe's two younger children, Ann and Oliver.    Robert and Carla Doe had placed Wayne outside the household, and desperately needed financial support for residential care and therapy.  The Does informed CFSA that Sara Doe was in the home but also needed residential care and therapy.

69.     Robert and Carla Doe also explained in the letter that the Twins' revelations shocked and traumatized the entire family.    The Doe's advised that they did not have the financial or emotional ability to undertake the proper residential and other treatments needed for Wayne and Sara.

70.     Robert and Carla Doe concluded the letter by requesting immediate financial assistance.  They offered to make therapists and other professionals available to the agency to discuss treatment and other options for Wayne and Sara.

71.     As a result of the letter, a meeting was scheduled at CFSA on October 1, 2004. Defendant Sandra Jackson chaired the meeting, and CFSA employees Dr. Tracey Campfield, Dr. Cheryl Williams, and Sharon Knight attended.   Robert Doe attended the meeting for the family, and two of the children's therapists attended as well.

*Amended Complaint - page 12*

72.    While the meeting was cordial, several CFSA employees expressed concern or made statements suggesting concern regarding the Does blaming the agency for the problems the Twins caused.  During the meeting, Robert Doe explained that Sara had been moved out of the house as a precaution and was staying with a relative, but the relative could not serve as a long-term placement option.   The meeting concluded with a pledge by Defendant Jackson to get back to the family promptly about finding another appropriate placement for Sara and to advise how CFSA might help regarding the other issues.

73.    On October 3, 2004, pursuant to a request made during the October 1 meeting, the Twins' therapists sent diagnostic summaries containing recommendations and assessments to CFSA via facsimile.  Importantly, the summaries strongly recommended that that the Twins needed to be placed in separate residential care and continue with their therapy, but the other children should remain with Robert and Carla Doe.

74.    On or about October 5, 2004, Defendant Sandra Jackson arranged a conference call with the same CFSA employees that attended the meeting on October 1, 2004, an employee from the General Counsel's office, and Robert Doe.  During the call, CFSA recommended that Wayne and Sara be placed in a therapeutic foster home together and that the Does sign a Voluntary Placement Agreement which would place Wayne and Sara in CFSA's care for up to sixty days.  CFSA would not disclose the location of the foster home, agree to continue the children's therapy, or explain how the Twins would be safe from each other.     Robert Doe stated that he would have to consider and get back to CFSA.

75.    On October 7, 2004, CFSA intake social worker Delores Williams visited Robert and Carla Doe's home and discussed the abuse issues.  Ms. Williams met Emma, Ann, and

Oliver, spoke with the children, and inspected the home.  Robert and Carla Doe advised Ms. Williams of the precautions they took after learning of the abuse among the children.  These precautions included advising the children's schools in writing, placing an alarm on Oliver's bedroom door, continuing therapy for all the children, maintaining Wayne and Sara outside the home, and closely supervising Oliver and Ann.

76.    CFSA records reveal that on October 7, 2004 Ms. Williams made entries in the FACES database describing the Does' reactions to the abuse and the immediate steps the family took to keep all of their children safe.

77.    An Investigation Summary (report # 609579) was prepared following the completion of Ms. Williams' investigation.  The report states, in part:

(A)    "Family has provided outside placements for two older children.  Parents have secured alarm system to monitor younger children's activity at night.  Parents have taken appropriate steps to ensure supervision of children at all times." (p.4)

(B)    "Based upon the information available at this time the current level of risk to the children in this family is low."  (p.5)

(C)    "There is no evidence found that would support any allegations of failure to protect or lack of supervision on the part of either parents."  (p. 10)

78.    On October 14, 2004, Robert Doe faxed a letter to Defendant Sandra Jackson asking that CFSA reconsider its proposal for the Twins.  Robert Doe emphasized that CFSA had an obligation under the *LaShawn* case to assist the family and provide adequate support for both Wayne and Sara.  He proposed that a very good placement be located for Sara, and that Wayne remain in his placement.  Robert Doe further proposed that CFSA pay for the placements, transportation, and continued therapy for the all members of the family.  Finally, Mr. Doe emphasized the trauma that the family was already enduring and asked that the requested

services be provided in order for the family to heal.

79.    On October 9, 2004, at the urging Ms. Williams, Robert and Carla Doe brought the two younger children, Ann and Oliver, to Safe Shores Children's Advocacy Center to be interviewed.    Metropolitan Police Department Detective James L. Goldring, CFSA Social Worker Delores Williams, and Assistant Attorney General ("AAG") Alexandra Kutz attended the interview.

80.    Robert and Carla Doe were advised that the interviews would be video taped and viewed by the officials present.    Robert and Carla Doe requested that an AAG from the abuse and neglect section of the District's Office of Attorney General be present.    Both Carla Doe and the officials present called the abuse and neglect section.    However, no AAG for abuse and neglect ever appeared for the interviews.

81.    Robert and Carla Doe asked if they could: (a) be with the children during the interview, (b) observe the interview with the officials, and (c) be given a copy of the video tape. These requests were denied and Rob and Carla Doe objected to going forward without being able to at least observe what was done to their already traumatized children.    Ms. Williams then advised Robert and Carla Doe that CFSA would take the Doe's children if they did not agree to the interviews.    Under duress, Robert and Carla Doe allowed the interviews to proceed, and they allowed Ann and Oliver to be examined medically.

82.    On the morning of October 19, 2004, Robert Doe telephoned Defendant Sandra Jackson and advised that juvenile law enforcement officials were now involved in Wayne and Sara's case.    Robert Doe asked Defendant Jackson to ensure that CFSA provided support for Wayne and Sara so they could receive therapeutic placements, continue with therapy, and

*Amended Complaint - page 15*

receive other necessary services.  Defendant Jackson said that CFSA would confer with AAG
Kutz.

83.    At approximately 2:00 p.m. on October 19, 2004, Defendants Sandra Jackson and
Heather Stowe telephoned Robert and Carla Doe.  They stated that the purpose of the call was to
ask that Robert and Carla Doe place four of their children into voluntary care pending an
investigation about allegedly inadequate parental supervision.  Defendants Jackson and Stowe did
not explain how the Doe's children were in any danger, nor did they offer services to preserve the
family while alleviating the alleged danger.  Threatening to remove Ann and Oliver from the
Doe's home was shocking to the family.  Robert and Carla Doe asked Defendants Jackson and
Stowe for time to consider CFSA's request for voluntary placement and call the agency back.

84.    Robert and Carla Doe were forced to hire a lawyer and called many friends and
family to provide possible placements for their children.    Robert and Carla Doe's overriding
concern was that none of the children, particularly Ann and Oliver, be subjected to further trauma.

85.    Robert and Carla Doe, with the assistance of counsel Harvey Schweitzer,
negotiated with Defendants Jackson and General Counsel Terri Thompson Mallet over the next
twenty-four hours.  At no time during the discussions did the Defendants identify any facts or
make any arguments that supported a legitimate basis for taking Robert and Carla Doe's children.

86.    In fact, during the course of the discussions on October 19 and 20, the Defendants
and other CFSA employees engaged in a campaign to remove the Doe's counsel from the case by
making bogus claims regarding conflict of interest.  This ploy wasted hours while Mr. Schweitzer
discussed his other client.  One or more CFSA employees had called Mr. Schweiter's other clients
in order to cause friction between Mr. Schweizer and the Doe family.  Fortunately, the situation

*Amended Complaint - page 16*

was resolved amicably.

87.    The Defendants and other CFSA employees attempted to strip the Doe's of legal representation at a critical moment so they could take the Doe's children without facing a timely legal challenge.

88.    Robert and Carla Doe suggested that they could bring their children to D.C. Superior Court the next morning while all of the issues were worked out and the court could determine the least harmful placement for the children. Robert and Carla also suggested other qualified persons who could take at least Ann and Oliver overnight, such as a family friend who is a licensed social worker, a lawyer with top secret government clearance, and a former CFSA employee. CFSA refused the placement, but on October 20, 2005, approved Carla Doe's mother as a possible placement, but gave no guarantee.

89.    All attempts at negotiation broke down when Defendant Mallet insisted that Oliver be placed in an undisclosed foster home overnight. When Robert Doe refused, Defendant Mallet stated words to the effect that any efforts to obstruct CFSA's action would result in arrest.

90.    Robert and Carla Does' lawyer advised CFSA that Defendant Mallet needed a court order to immediately remove any of Robert and Carla Doe's children. Defendant Mallet refused to seek the intervention and approval of the court.

91.    Under duress and the threat of arrest, and after speaking with the children's therapists, Robert and Carla Doe agreed to allow CFSA to remove Ann and Oliver on October 20, 2004 at 9 p.m. The Does also advised the Defendants of the Twins' locations. Robert and Carla Doe had to contact Wayne and Sara's care-givers and advise that the Defendants would be picking them up and would be taking them to an undisclosed foster home. This caused Robert

and Carla Doe and Ann, Oliver, Wayne and Sara severe emotional distress and anxiety.

92.    At or around 9 p.m. on October 20, 2004, Defendants Daphne King and Rebekah Philippart came to Robert and Carla Doe's home to take four of their children. Defendants King and Philippart presented the Does with a "Notice to Appear in Family Court." The notice concerned Wayne, Sara, Ann, and Oliver. The Notice is a form with hand-written information provided in spaces. The Notice stated the Doe's children were being removed "due to imminent danger." The Notice was not signed by any CFSA employees or officials; the signature lines were left blank.

93.    Robert Doe asked the Defendants to tell him what imminent danger was being addressed. The Defendants replied that they did not know.

94.    Robert Doe asked the Defendants what the legal basis was for taking their children. The Defendants replied that they did not know and they referred to the unsigned Notice form.

95.    Robert Doe then advised Defendants King and Philippart that they were engaging in an improper act and could be held personally liable for their actions. The Defendants provided no substantive response.

96.    Robert and Carla Doe prepared Ann and Oliver to leave with the social workers. Ann and Oliver were taken against their will and forced in the Defendants' cars. They cried horribly but their distressed parents reluctantly urged them to go.

97.    Two unidentified Social Workers were also present at the Doe's home and are believed to have assisted Defendants King and Philippart throughout the evening.

98.    One Social Worker picked up Sara from Carla Doe's mother's home, and against

Sara's will and without Robert and Carla Doe's consent took her away to an undisclosed foster home.

99.    Ann, Oliver, and Sara were taken against their will and without consent to Children's Hospital were they were subjected to invasive physical examinations. Oliver and Sara were placed in undisclosed foster homes after midnight. Fortunately, Ann was placed with Carla Doe's mother.

100.    Ann, Oliver and Sara were taken on October 20, 2004 negligently and maliciously. The act was designed to further harm Robert and Carla Doe and their children. Defendants Walker, Maxwell, Jackson, Stowe, and Mallet orchestrated these acts, and other Defendants carried them out. Although Wayne was listed on the Notice as being in imminent danger he was never taken into custody.

101.    There was neither imminent danger nor any factual or legal basis for taking Ann, Oliver, and Sara from their homes.

102.    At the time the children were removed from their home, the Defendants all knew that there were no bases to claim that the children were in "imminent danger" nor were there any other factual or legal bases for taking such drastic action.

103.    On October 21, 2004, Defendant District of Columbia and its employees filed four complaints against Robert and Carla Doe. The complaints falsely alleged that Robert and Carla Doe had sexually abused Sara, Wayne, Oliver, and Ann.

104.    The complaints failed to claim that any of the children were in imminent danger.

105.    The complaints were signed by two social workers whose names are illegible. However, the signatures appear to be on behalf of Delores Williams and Michele Brigman.

106.    On October 21, 2004, Robert and Carla Doe, and Defendants were scheduled to appear in D.C. Superior Court at 11:00 a.m.   None of the individual Defendants appeared. Defendant District appeared and was represented by abuse and neglect section AAG Debra Dickstein.   Defendant District appeared over an hour late.   AAG Dickstein informed Robert and Carla Doe before the case was called that the case was being "no papered;" that is, no petition was drafted or filed.

107.    Defendant Walker in her role as Director of CFSA is a policymaker for the agency. Defendant Walker was consulted, aware of and approved of all actions taken regarding the Robert and Carla Doe.

108.    Defendant Mallet in her role as General Counsel of CFSA is the chief legal officer and a policymaker for CFSA.   Defendant Mallet was consulted, aware of, and approved of all actions taken regarding the Robert and Carla Doe.

109.    Defendant Maxwell was a Deputy Director at CFSA and had direct responsibility over persons involved in taking the Doe's children.   Defendant Maxwell was a policymaker for CFSA.   Defendant Maxwell orchestrated and/or approved the actions taken against Robert and Carla Doe.

110.    Defendant Jackson is the Administrator of CFSA's Adoption and Foster Care Administration and a policymaker for CFSA.   Defendant Jackson orchestrated and approved the actions taken against Robert and Carla Doe.

111.    Defendant Stowe was the Administrator for Intakes and Investigations for CFSA and a policymaker for CFSA.   Defendant Stowe orchestrated and approved the actions taken against Robert and Carla Doe.

112.    Immediately following the October 21 hearing, Robert and Carla Doe met with CFSA Supervisory Social Worker Michele Brigman. Ms. Brigman assisted the Does in getting their son Oliver out of foster care. Oliver wasn't returned to his parents until approximately 4:00 p.m.

113.    Ms. Brigman advised Robert and Carla Doe that CFSA had arranged a placement in a good therapeutic foster home for Sara. Robert and Carla Doe agreed to voluntarily place Sara in a therapeutic foster home in order to allow her to receive additional assistance. The Voluntary Placement Agreement provides that Robert and Carla Doe can request the return of Sara to their custody at any time. In addition, the agreement provides that medical and other treatments may be arranged by CFSA, but require parental consent, except in an emergency.

114.    On October 22, 2004, AAG Alexandra E. Kutz signed an affidavit and request for custody order for Sara. Sara was charged with allegedly fondling or touching the genitals of her younger siblings. The affidavit and request for custody order alleged that Sara's alleged touching constituted Second Degree Child Sex Abuse. The custody order request is the juvenile equivalent of an arrest warrant. On October 25, 2004, an Order for Custody was signed by a District of Columbia Superior Court Judge.

115.    Similarly, on October 22, 2004, AAG Kutz signed an affidavit and request for custody order for Wayne. Wayne was charged with allegedly fondling or touching the genitals of his younger siblings. The affidavit and request for custody order alleged that Wayne's alleged touching constituted Second Degree Child Sex Abuse. On October 25, 2004, an Order for Custody was signed by a District of Columbia Superior Court Judge.

116.    On October 27, 2004, Sara was picked up by Defendant Social Worker Mable

*Amended Complaint - page 21*

Boler after school.   Defendant Boler, after making one or more stops, took Sara to Children's Hospital for a physical examination.  Robert and Carla Doe were not contacted about this medical examination nor did they consent.

117.    Defendant Boler picked Sara up at approximately 5:00 p.m. and was eventually taken to Children's Hospital.    At approximately 8:00 p.m., while still waiting to be seen at Children's Hospital, Defendant Boler called Sara's foster parent to indicate that Sara would be home soon.  Sara was made to wait until almost 2:00 a.m. before she was seen by the doctors. Sara was scared; she and was subjected to a physical exam against her will and without her parents' consent.  The Doctors asked Sara personal questions by the doctors and completed the exam sometime after 3:45 a.m.

118.    Sara's foster parent became worried and called a CFSA supervisory social worker on duty and Sara's foster care social worker.  Neither social worker assisted her in finding Sara's whereabouts.  Sara's foster parent then called the police to report her missing, and concluded the call just as Defendant Boler arrived at her house with Sara.  When Defendant Boler brought Sara into the house she advised the foster parent that Sara had not had dinner.  The time at this point was approximately 4:20 a.m.

119.    During this unauthorized medical examination, Sara was subjected to violations of her constitutional rights, false imprisonment, invasion of privacy, assault, battery, and intentional infliction of emotional distress.

120.    On November 16, 2004, the Twins were taken into custody at the District of Columbia Metropolitan Police Department's juvenile processing facility located at 501 New York Ave., NW, Washington, D.C.

*Amended Complaint - page 22*

121.    Sara was taken into custody at approximately 7:30 a.m., and Wayne was taken into custody at approximately 9:30 a.m.

122.    The Twins' cases were not called until approximately 4:00 p.m.  At the conclusion of their cases, the Twins were released to Robert and Carla Doe to be placed with foster parents. The cases were concluded at approximately 4:30 p.m.

123.    The Twins were not released until approximately 7:30 p.m.  While in custody the children were scared and believed that they would be left in jail or not allowed to return home.

124.    Specifically, both Sara and Wayne were restrained or placed in a cell during the 10 - 12 hours they spent in custody.  At one point, Wayne was shackled and other juvenile inmates spat on him, and were violent and disruptive.

125.    Wayne and Sara were placed on probation by D.C. Superior Court Judge Fern Saddler.   The Twins were ordered to engage in group sex-offender treatment through the D.C. Superior Court's Child Guidance Clinic.

126.    Due to their offenses and severe emotional disturbances, Wayne and Sara were ordered Judge to be under 24-hour adult supervision, and not permitted to be with children under the age of thirteen unsupervised.  Consequently, they were unable to return home or share a home with their victims.

127.    Initially, CFSA provided support for the foster care and some of the other services Wayne and Sara needed.  However, that support was short lived.  Less than one year later, CFSA discontinued services, even though Wayne and Sara had not completed the necessary treatment. No meaningful post-adoption services were offered to assist the Doe family and help move Wayne and Sarah toward stability.

128.    When CFSA declined to provide further post-adoption support for the Twins, the family was forced to turn to the D.C. Department of Youth Rehabilitation Services (DYRS) for additional services.    DYRS agreed to provide services for Wayne and Sara provided their probation was revoked and they were placed in unrestricted commitment with the agency.

129.    On September 29, 2005, Sara's probation was revoked and she was placed in unrestricted commitment with DYRS.

130.    On November 14, 2005, Wayne's probation was revoked and he was placed in unrestricted commitment with DYRS.

131.    DYRS agreed to provide an individual services plans (ISP) for each child.  The main components of the Twins' ISPs involved assisting the children with: (a) reconnecting with their family through therapy involving parents and other family members; (b) treating their attachment disorder issues; (c) treating their sexual offender issues; (d) providing the children with coping skills; (e) supporting the children in school and in their foster homes; and (f) maintaining compliance with DYRS's aftercare agreement.

132.    Robert and Carla Doe participated extensively in meetings and other communications with DYRS officials in an effort to fashion appropriate services for the Twins.

133.    No licensed psychologists or psychiatrists assisted DYRS in developing appropriate treatment plans for Wayne or Sara.  DYRS staff, the staff from the core service agency contractor First Home Care, and the children's therapeutic foster parents, had virtually no understanding of the issues related to reactive attachment disorder or similar attachment problems.  Nor did DYRS and First Home Care staffs have sufficient understanding of sexual-offender treatment and the steps the Twins needed to take to become healthy.

134.    The ISPs DYRS proposed did not articulate treatment or services that would actually help rehabilitate Sara and Wayne.  Consequently, Robert and Carla Doe frequently raised questions or concerns about DYRS's proposed plans for their children.  Robert and Carla Doe also objected to the service providers who did not have backgrounds or experience that could adequately address the Twins' issues.

135.    Unfortunately, Wayne and Sara became more alienated from their family as time passed.  DYRS and First Home Care made no meaningful effort to insure that the Twins' foster parents and service providers worked toward reuniting Wayne and Sara with their family.

136.    Robert and Carla Doe had to endure an undercurrent of discrimination and prejudice, and occasional racial remarks because they are White and Sara and Wayne are Black. In one meeting, a First Home Care community support worker stated words to the effect that Wayne found it too stressful to have to deal with White people.  In another meeting the same community support worker stated words to the effect that there were "cultural differences" that effected the relationship between Wayne and his family.

137.    Robert and Carla Doe's expressed their concerns about the Twins' plans and treatment to DYRS and First Home Care.  The concerns were often expressed in writing, but were frequently not addressed.  Robert and Carla Doe also sought expert advice and treatment for the Twins, but First Home Care and DYRS ignored their efforts.

138.    In response to the concerns Robert and Carla Doe raised, DYRS officials retaliated and refused to provide information, and engaged in communications and actions designed to separate Robert and Carla Doe from their children.  DYRS made it impossible to insure that the Twins received timely and appropriate services.

*Amended Complaint - page 25*

139.    DYRS entirely ignored the needs of Ann, Emma, and Oliver to obtain closure with the Twins. DYRS did not require Wayne or Sara to follow the treatment steps set out in the Court ordered Child Guidance Clinic process.

140.    DYRS did not provide records of the services the Twins received, nor did it require service providers to prepare written treatment plans. It also refused to coordinate services among treatment providers to insure that all were working toward compatible goals.

141.    On May 4, 2007, Robert and Carla Doe sent a letter to DYRS Special Assistant Mary Phillips raising concerns about baseless allegations raised against them in a May 2 meeting. The allegations claimed that Robert and Carla Doe delayed Wayne's school placement; caused a break in his therapy; and generally did not approve of black professionals to assisting their children. Ms. Phillips raised these unfounded issues in front of Wayne and others in a meeting. In their letter, Robert and Carla Doe challenged these allegations, provided the facts surrounding each issue, and urged Ms. Phillips to move forward.

142.    On May 7, 2007, Robert and Carla Doe sent another letter to Ms. Phillips. They expressed their concerns about DYRS's failure to participate in Sara's scheduled team meeting, and Sara's sudden decision to stop attending therapy.

143.    DYRS provided no response of any kind to the serious concerns raised in the May 4 and May 7 letters.

144.    On May 12, 2007, Robert and Carla Doe filed the FOIA request with DYRS seeking all information pertaining to their family. DYRS refused to provide any records. DYRS's refusal is currently being challenged in the D.C. Superior Court.

145.    Instead of professionally addressing the issues Robert and Carla Doe raised, DYRS

retaliated by suddenly closing the Twins' cases. On or about May 13, 2007, Robert and Carla Doe received a memo from Mary Phillips addressed to the D.C. Superior Court stating that DYRS was closing the children's cases. Case closure was not discussed in any DYRS meeting or plan. In fact, in a May 2 meeting concerning Wayne case closure was not mentioned.

146.    DYRS's action gave Robert and Carla Doe six business days to find alternative care for the Twins. DYRS officials knew that Wayne and Sara had not successfully completed sex-offender treatment and were not safe to return home and live with the younger siblings who they abused.

147.    Robert and Carla Doe filed a petition with the Family Court challenging DYRS's decision to close their children's cases and cut off services, but the Court provided no relief.

148.    Robert and Carla Doe contacted CFSA but CFSA claimed it was unable to provide continued long term services for the Twins. Consequently, Robert and Carla Doe were forced to give up their parental rights and relinquish the Wayne and Sara back to CFSA's care.

149.    DYRS never gave Robert and Carla Doe any information or explanation regarding the sudden closure of the Twins' cases.

150.    DYRS officials intended to take action to remove Robert and Carla Doe from the Twins' lives because of their status as adoptive parents, and as White parents of Black children.

151.    Moreover, DYRS officials used their authority to close the Twins' cases in retaliation against Robert and Carla Doe for seeking caring and competent professionals to provide services for their children, and for raising concerns about the conduct of DYRS and First Home Care officials.

152.    At all times relevant to this Complaint all of the Defendants and their agents were

aware of the Doe family's ongoing trauma. Specifically, the Defendants were aware of the Doe children's emotional injuries and the sensitive natures of the children. Despite this knowledge, the Defendants made clear efforts to cause as much emotional damage, pain and suffering as possible. The Defendants acted negligently and inflicted great injury and further trauma on each of the Plaintiffs.

## VIOLATIONS OF PLAINTIFFS' RIGHTS UNDER THE U.S. CONSTITUTION PURSUANT TO 42 U.S.C. §§ 1983, 1985

### <u>Count I</u>

153.    The preceding paragraphs are realleged and incorporated by reference.

154.    Defendant District's CFSA has been under Court supervision for at least fourteen years due to its legally substandard programs for children and families in the foster care and adoption system. During this period, CFSA has experienced great difficulties in maintaining trained and competent staff and has been criticized by the Court, Court Monitor and others about its training of employees and contractors.

155.    The acts and omissions of Defendant District, with respect to the hiring, training, and supervising social workers, attorneys, and managers, constitute customs, policies, and/or practices of Defendant District that are widespread and persistent. These customs, policies, and/or practices proximately caused injuries to the Plaintiffs.

156.    Further, Defendant District acted with deliberate indifference toward the constitutional rights of all of the Plaintiffs in that it failed to: (a) properly train its employees; (b) properly supervise its employees; and (c) failed to protect Robert and Carla Doe and their children from harm. Such deliberate indifference amounts to violations of the Plaintiffs' rights under the Fifth Amendment of the U.S. Constitution, proximately causing injury to the Plaintiffs.

Therefore, Defendant District is liable to the Plaintiffs for violations of their civil rights under 42 U.S.C. § 1983.

## Count II

157.    The preceding paragraphs are realleged and incorporated by reference.

158.    For at least the last fourteen years, CFSA has failed to provide adequate assistance to adoptive families and has failed to properly investigate allegations of child abuse or neglect as required by law.

159.    The acts and omissions of Defendant District, with respect to the lack of training and supervision of employees and assistance to adoptive families constitute customs, policies, and/or practices of Defendant District that are widespread and persistent.  These customs, policies, and/or practices proximately caused the Plaintiffs' injuries.

160.    Further, Defendant District and individual Defendants Walker, Maxwell, Jackson, Mallet, and Stowe acted with deliberate indifference to the Plaintiffs' constitutional rights when they unlawfully threatened and conspired to remove, and then removed Ann, Oliver and Sara from their homes.   Such deliberate indifference amounts to violations of the Plaintiffs rights under the Fifth Amendment of the U.S. Constitution, proximately causing injury to the Plaintiffs. Therefore, the Defendants are liable to the Plaintiffs for violations of their civil rights under 42 U.S.C. § 1983.

## Count III

161.    The preceding paragraphs are realleged and incorporated by reference.

162.    The acts and omissions of Defendant District, with respect to the lack of training and supervision of employees and assistance to adoptive families constitute customs, policies,

and/or practices of Defendant District that are widespread and persistent. These customs, policies, and/or practices proximately caused the Plaintiffs' injuries.

163.    Further, Defendant District and the individual Defendants acted with deliberate indifference toward the Plaintiff's constitutional rights and purposely violated the law when they threatened to remove and then removed Ann, Oliver and Sara from their homes. Such deliberate indifference and intentional violations of law shocks the conscience and amounts to gross violations of the Plaintiffs' Substantive and Procedural Due Process rights under the Fifth Amendment of the U.S. Constitution, proximately causing injury to the Plaintiffs. Therefore, Defendant District and the individual Defendants are liable to the Plaintiffs for violations of their civil rights under 42 U.S.C. § 1983.

## Count IV

164.    The preceding paragraphs are realleged and incorporated by reference.

165.    Defendant District's CFSA has been under Court supervision for at least fourteen years due to its legally substandard programs for children and families in the foster care and adoption system. During this period, CFSA has resented and resisted Court involvement, and, in many instances, refused to timely comply with court-ordered improvements. Defendant District's resistance resulted in the Court's institution of partial and full receiverships. In addition, Defendant District officially promoted and sanctioned resistance to improvements to the foster care and adoption system, and created a culture within CFSA that approves of or condones retaliatory, incompetent and/or illegal employee conduct. This culture constitutes customs, policies, and/or practices of the District that are widespread and persistent. These customs, policies, and/or practices proximately caused injuries to the Plaintiffs.

*Amended Complaint - page 30*

166.    Robert and Carla Doe petitioned Defendant District for assistance through CFSA, as court-ordered in *LaShawn*.   Individual Defendants Walker, Maxwell, Jackson, Mallet, and Stowe are management officials within CFSA with policymaking authority.   In response to the Plaintiffs' requests for assistance, Defendant District and individual Defendants Walker, Maxwell, Mallet, Jackson, Stowe, and others retaliated against the Plaintiffs.  Such retaliation was a deliberate violation of the Plaintiffs' rights under the First Amendment of the U.S. Constitution, proximately causing injury to the Plaintiffs.   Therefore, Defendant District and individual Defendants Walker, Mallet, Jackson, and Stowe are liable to the Plaintiffs for violations of their civil rights under 42 U.S.C. § 1983.

## Count V

167.    The preceding paragraphs are realleged and incorporated by reference.

168.    As previously described, Defendant District officially promoted and sanctioned resistance to improvement in the foster care and adoption system, and created a culture within CFSA that approves of or condones retaliatory, incompetent and/or illegal employee conduct. This culture constitutes customs, policies, and/or practices of Defendant District that are widespread and persistent.  These customs, policies, and/or practices proximately caused injuries to the Plaintiffs.

169.    Robert and Carla Doe engaged in speech protected by the U.S. Constitution when they raised concerns to Defendant District, through CFSA, regarding CFSA's failure to properly assess the Twins prior to their adoption, and the need for comprehensive post-adoption services and support.   Individual Defendants Walker, Maxwell, Jackson, Mallet, and Stowe are management officials within CFSA with policymaking authority.   In response to the Plaintiffs'

statements Defendant District and individual Defendants Walker, Maxwell, Mallet, Jackson, Stowe, and others retaliated against the Plaintiffs. Such retaliation was a deliberate violation of the Plaintiffs' rights under the First Amendment of the U.S. Constitution, proximately causing injury to the Plaintiffs. Therefore, Defendant District and individual Defendants Walker, Mallet, Jackson, and Stowe are liable to the Plaintiffs for violations of their civil rights under 42 U.S.C. § 1983.

170.    Further, in response to Robert and Carla Doe raising concerns about the planning, security, and care of the Twins, Defendant District, through DYRS and First Home Care officials, retaliated against the Plaintiffs. The DYRS officials involved were management officials with policymaking authority. It is the custom, policy, and/or practice of DYRS to retaliate against persons who raise concerns about the agency or the conduct of its officials. Such retaliation is a deliberate violation of the Plaintiffs' rights under the First Amendment of the U.S. Constitution, proximately causing injury to the Plaintiffs. Therefore, Defendant District is liable to the Plaintiffs for violations of their civil rights under 42 U.S.C. § 1983.

## Count VI

171.    The preceding paragraphs are realleged and incorporated by reference.

172.    Defendant District's widespread and persistent customs, policies and practices involving inadequate training and supervision, and the culture within CFSA that condones or approves of incompetent, retaliatory, or illegal employee conduct proximately caused injuries to the Plaintiffs.

173.    Further, Defendant District of Columbia and the individual Defendants acted with deliberate indifference toward the constitutional rights of Ann, Oliver, and Sara when they

*Amended Complaint - page 32*

unlawfully threatened to remove and then removed Ann, Oliver and Sara from their homes. Defendants violated D.C. Code § 16-2309(a) when they threatened to remove and then removed Ann, Oliver, and Sara from their homes. Such deliberate indifference amounts to violations of the Plaintiffs' rights to be free from unreasonable search and seizure as provided by the Fourth Amendment of the U.S. Constitution, proximately causing injury to the Plaintiffs. Therefore, the Defendants are liable to Plaintiffs for violations of their civil rights under 42 U.S.C. § 1983.

### Count VII

174.    The preceding paragraphs are realleged and incorporated by reference.

175.    Defendant District's widespread and persistent customs, policies and practices involving inadequate training and supervision and the promotion of a culture within CFSA that condones or approves of incompetent, retaliatory, or illegal conduct by its employees proximately caused injuries to the Plaintiffs.

176.    Further, Defendant District and the individual Defendants acted with deliberate indifference toward the Plaintiffs' constitutional rights when they unlawfully threatened to remove the children and then removed Ann, Oliver and Sara from their homes. Such deliberate indifference amounts to violations of the Plaintiffs rights to Due Process of law as provided by the Fifth Amendment of the U.S. Constitution, proximately causing injury to the Plaintiffs. Therefore, the Defendants are liable to the Plaintiffs for violations of their civil rights under 42 U.S.C. § 1983.

### Count VIII

177.    The preceding paragraphs are realleged and incorporated by reference.

178.    Defendant District's persistent and widespread customs, policies and practices

involving inadequate training and supervision, and the culture that condones or approves of incompetent, retaliatory, or employee illegal conduct proximately caused injuries to the Plaintiffs.

179.    Further, Defendant District and the individual Defendants acted with deliberate indifference toward the Plaintiffs' constitutional rights when they unlawfully threatened to remove and then removed Ann, Oliver and Sara Doe from their homes.    Such deliberate indifference amounts to violations of the Plaintiffs' right to privacy as provided by the First and Ninth Amendments of the U.S. Constitution, proximately causing injury to the Plaintiffs. Therefore, the Defendants are liable to Plaintiffs for violations of their civil rights under 42 U.S.C. § 1983.

## Count IX

180.    The preceding paragraphs are realleged and incorporated by reference.

181.    Defendant District's persistent and widespread customs, policies and practices involving inadequate training and supervision, and the culture that condones or approves of incompetent, retaliatory, or illegal employee conduct proximately caused injuries to the Plaintiffs.

182.    Further, Defendant District and individual Defendants acted with deliberate indifference toward the constitutional rights and conspired to violate the rights of the Plaintiffs when the Defendants sought to arrest and prosecute the Twins in the juvenile system.  Defendant District initiated the action in retaliation for Robert and Carla Doe's petition to CFSA for assistance, and/or to discriminate against the Twins based on their status as adopted children. Defendant District's actions denied the children and their parents' right to equal protection.    The Defendants actions proximately caused injury to the Plaintiffs.  Therefore, the Defendants are liable to the Plaintiffs for violations of their civil rights under 42 U.S.C. §§ 1983, 1985.

## Count X

183.    The preceding paragraphs are realleged and incorporated by reference.

184.    Defendant District's widespread and persistent customs, policies and practices involving inadequate training and supervision, and the culture that condones or approves of incompetent, retaliatory, or illegal employee conduct proximately caused injuries to the Plaintiffs.

185.    Further, Defendant District acted with deliberate indifference toward the Plaintiffs' constitutional rights when the Defendant obtained under duress the custodial interviews of 7-year-old Ann and 9-year-old Oliver.  These custodial interviews violated Oliver's Fifth Amendment right against self-incrimination, and violated Robert, Carla and Ann's right to privacy as provided by the First and Ninth Amendments of the U.S. Constitution, proximately causing injury to the Plaintiffs.  Therefore, the Defendants are liable to the Plaintiffs for violations of their civil rights under 42 U.S.C. § 1983.

## Count XI

186.    The preceding paragraphs are realleged and incorporated by reference.

187.    Defendant District's widespread and persistent customs, policies and practices involving inadequate training and supervision, and the cultures within CFSA and DYRS that condone or approve of incompetent, retaliatory, or illegal employee conduct proximately caused injuries to the Plaintiffs.

188.    Defendant District violated the Plaintiffs' rights to equal protection and acted with deliberate indifference toward the Plaintiffs' constitutional rights.  Robert and Carla Doe were intentionally treated differently from other similarly situated parents and families who receive services from DYRS or CFSA.  DYRS without any rational basis or adequate warning terminated

the Twins' services.  Moreover, CFSA refused to provide long term services for the Twins until Robert and Carla Doe relinquished their parental rights.

189.    The unequal, discriminatory and retaliatory treatment Robert and Carla Doe received was motivated and driven by illegitimate animus, and the vindictive motivations of DYRS and CFSA officials.

190.    As a result of these actions, Defendant District is liable to the Plaintiffs for violations of their constitutional rights under 42 U.S.C. § 1983.

## INTENTIONAL TORTS

### Count XII - Civil Conspiracy

191.    The preceding paragraphs are realleged and incorporated by reference.

192.    Defendant District and the individual Defendants conspired to and/or took direct action to violate the laws and policies of the District of Columbia, violate federal laws, and violate the Plaintiffs' constitutional rights.    The conspiracy undertaken by the individual Defendants resulted in the infliction of harm to the Plaintiffs.

### Count XIII - Assault

193.    The preceding paragraphs are realleged and incorporated by reference.

194.    Defendant District and the individual Defendants intentionally and unlawfully caused apprehension of imminent physical harm to Ann and Oliver.   As a result of the acts of the individual Defendants, Ann and Oliver suffered and continue to suffer anxiety, pain, post-traumatic stress, humiliation, fear, and other damages.

### Count XIV - Battery

195.    The preceding paragraphs are realleged and incorporated by reference.

196.    Defendant District and the individual Defendants or their agents, as described in the preceding statement of facts, intentionally and unlawfully touched and restrained Ann and Oliver without their parents consent.   As a result of the acts of the individual Defendants, Ann and Oliver suffered and continue to suffer anxiety, pain, post-traumatic stress, humiliation, fear, and other damages.

### Count XV - Intentional Infliction of Emotional Distress

197.    The preceding paragraphs are realleged and incorporated by reference.

198.    The acts of Defendant District and the individual Defendants or their agents were extreme, outrageous, and intentional, and/or undertaken in reckless disregard and deliberate indifference to the consequences and impacts those acts would have on the Plaintiffs.  As a result of the acts of the individual Defendants and their agents, the Plaintiffs suffered, continue to suffer, and will suffer in the future anxiety, pain, post-traumatic stress, humiliation, fear, and other damages.

### Count XVI - Negligence

199.    The preceding paragraphs are realleged and incorporated by reference.

200.    The acts of Defendant District and the individual Defendants or their agents, under the requirements of District of Columbia and Federal laws demonstrate that the Defendants had a duty to properly evaluate and assess the Twins before they were placed for adoption.    the Defendants breached that duty when they negligently and recklessly placed the Twins with the Doe family.  As a result of the Defendants' breach of duty the Plaintiffs suffered, continue to suffer, and will suffer in the future anxiety, pain, post-traumatic stress, humiliation, fear, and other damages.

*Amended Complaint - page 37*

## Count XVII - Misrepresentation

201.   The preceding paragraphs are realleged and incorporated by reference.

202.   Defendant District and the individual Defendants or their agents made false statements or omissions of fact to Robert and Carla Doe concerning the overall health and family history of the Twins violating their duty of reasonable care.  These false statements or omissions were detrimentally relied upon by Robert and Carla Doe when they adopted and sought therapy for the Twins.  As a result of this reliance, the Plaintiffs suffered, continue to suffer, and will suffer in the future anxiety, pain, post-traumatic stress, humiliation, fear, financial losses and other damages.

## Count XVIII - Malicious Prosecution and Abuse of Process

203.   The preceding paragraphs are realleged and incorporated by reference.

204.   The acts of Defendant District and the individual Defendants or their agents resulted in the initiation of a civil child abuse and neglect proceeding in the D.C. Superior Court. There was no factual or legal base for the claims of abuse or neglect.  The Defendants acted with malicious intent in planning and initiating the action against Robert and Carla Doe.  The proceeding was terminated in the Plaintiffs' favor.  As a result of the Defendants' actions, the Plaintiffs suffered, continue to suffer, and will suffer in the future anxiety, pain, post-traumatic stress, humiliation, fear, financial losses and other damages.

## Count XIX - Selective Prosecution

205.   The preceding paragraphs are realleged and incorporated by reference.

206.   The acts of Defendant District and the individual Defendants or their agents resulted in the initiation of a juvenile criminal proceeding against the Twins in the D.C. Superior

Court.   Other similarly situated children are not prosecuted for such offences, particularly when the children are subjects of open abuse or neglect cases.   Defendant District brought the juvenile criminal cases against the Twins because the Defendants' failed to successfully establish an abuse and neglect case against Robert and Carla Doe, and in retaliation for Robert and Carla Doe's insistence on better services for the family.    As a result of the Defendants' actions the Plaintiffs suffered, continue to suffer, and will suffer in the future anxiety, pain, post-traumatic stress, humiliation, fear, financial losses and other damages.

## Count XX - Defamation

207.   The preceding paragraphs are realleged and incorporated by reference.

208.   The acts of Defendant District and individual Defendants or their agents are defamatory and have damaged the Plaintiffs' reputations.  Specifically, the false charges of abuse and the removal of several of the children from their home without cause or legal basis has placed Robert and Carla Doe in a false light in the legal community and with the public at large.  As a result of the Defendants' actions the Plaintiffs suffered, continue to suffer, and will suffer in the future anxiety, pain, post-traumatic stress, humiliation, fear, and other damages.

## Count XX I - Invasion of Privacy

209.   The preceding paragraphs are realleged and incorporated by reference.

210.   The acts of Defendant District and the individual Defendants or their agents unlawfully invaded the Plaintiff's privacy.   Specifically, the Defendants took actions and conspired to act to intrude into the Plaintiffs' home and personal lives in a manner not authorized by law.  As a result of the Defendants' actions, the Plaintiffs suffered, continue to suffer, and will suffer in the future anxiety, pain, post-traumatic stress, humiliation, fear, and other damages.

## Count XXII - Negligent Hiring and/or Supervision

211.    The preceding paragraphs are realleged and incorporated by reference.

212.    Defendant District had notice for over a decade of the illegal and incompetent actions of CFSA and its employees.  Despite this awareness, Defendant District has failed to institute and implement sufficient hiring and promotion policies, supervisory structures and administrative policies that would eliminate or significantly minimize the negligent or illegal acts of CFSA employees.   As a direct result of the District's negligence, CFSA employees unsuited for the demanding roles of social worker, supervisory social worker, administrator, and counsel were hired and/or promoted within CFSA to these positions of authority.  These persons, as identified in the preceding statement of facts, took actions against the Plaintiffs in violation of the U.S. Constitution and Federal laws, and the policies, regulations, and laws of the District of Columbia.  The District knew or should have known that these employees were either unsuited for their positions or that close supervision and substantive training would be needed to insure that they performed appropriately.   As a result of the District's negligent hiring and/or supervision, the Plaintiffs suffered, continue to suffer, and will suffer in the future anxiety, pain, post-traumatic stress, humiliation, fear, financial loss, and other damages.

## Count XXIII – Violation of Defendant District and Federal and District Laws in Failing to Timely and Adequate Post-Adoption Services

213.    The preceding paragraphs are realleged and incorporated by reference.

214.    The Defendants failed to properly respond to the Plaintiffs' post-adoption needs. This Court's decisions in  *LaShawn A.* requires that all services necessary to preserve families shall be available to adoptive families, including subsequent to the finalization of adoption. *LaShawn A.*, Modified Final Order, Section VIII, G.2.

*Amended Complaint - page 40*

215.    The Plaintiffs sought the following services: (a) appropriate and suitable residential or foster family placement for the Twins due to their severe emotional problems and need for treatment; (b) appropriate therapy for the other Plaintiffs, including family therapy; (c) transportation assistance; and (d) other needs as may be identified in the future.

216.    Instead of providing the necessary services, Defendant District Attorney General's Office engaged in a campaign to retaliate against the Plaintiffs for seeking services.  Such conduct is a serious violation of *LaShawn*, and the spirit and intent of the Implementation Plan.

217.    In addition, Defendant District failed to have a suitable plan in place for post-adoption needs such as those required for the Twins.  Due to this failure, CFSA was initially unable to insure proper treatment.  As a result CFSA pursued an unsubstantiated abuse and neglect charge against Robert and Carla Doe, and ultimately initiated juvenile charges against the Twins.   These ill-conceived actions demonstrate that CFSA violated *LaShawn* to provide appropriate post-adoption services and has no present capability to provide such services.

218.    Following meetings between Robert and Carla Doe and Defendant Walker, efforts were initiated to provide services.   However, CFSA's efforts are insufficient to meet the Plaintiffs' needs.   Therefore, Court intervention is warranted.

## COUNT XXIV - PUNITIVE DAMAGES

### Individual Defendants

219.    The preceding paragraphs are realleged and incorporated by reference.

220.    The acts of the individual Defendants, as described in the preceding statement of facts, were outrageous, wanton, and reckless, and were taken in willful disregard of the Plaintiffs rights and in disregard of their condition as an adoptive family with fragile adopted children.

*Amended Complaint - page 41*

**Defendant District**

221.    The actions of Defendant District have resulted in the creation of a foster care and adoption system that has functioned negligently and well below standards set by Federal and District law since 1987.   Defendant District, with the support of District of Columbia taxpayers, is directly responsible for perpetrating the policies that caused the Plaintiff's injuries.  In addition, Defendant District and its policymakers intentionally adopted unconstitutional and/or illegal policies and practices concerning the assessment and placement of adoptive children and the removal of children from their homes.   These extraordinary circumstances require that punitive damages against Defendant District be awarded.

## PRAYER FOR RELIEF

222.    WHEREFORE, the Plaintiffs request that the Court provide the following relief:

(A)    Enjoin the Defendants, and specifically the individual Defendants, from engaging in any further actions against the Plaintiffs in violation of their rights under federal laws, the U.S. Constitution, and the laws of the District of Columbia.

(B)    Declare that the actions taken by the Defendants were unlawful.

(C)    Award compensatory damages, damages for pain and suffering, and damages for emotional distress jointly and severally against the Defendants for the acts complained of in an amount not less than $5 million.

(D)    Award punitive damages against the Defendants for their wanton, willful, and malicious acts as follows:

(1)    Against Defendant District in an amount of not less than $10 million;

(2)    Against each of the individual Defendants in an amount of not less than

$250,000.

(E)    Order Defendant District to provide all post-adoption services requested herein consistent with the needs of the Plaintiffs, *LaShawn,* and the Implementation Plan.

(F)    Award all attorneys' fees, expert witness fees, and costs of litigation.

(G)    Order that the names of Robert and Carla Doe be removed from any abuse and neglect or other list/registry maintained by CFSA.

(H)    Order that the names of Robert and Carla Doe be removed from the records of the D.C. Superior Court and/or any other District or Federal agency in connection with any allegation of abuse or neglect of their children, and that all records maintained by the D.C. Superior Court regarding the abuse and neglect proceeding initiated by the Defendants be expunged from the records of the Court;

(I)    Order that all children presently in the custody or control of CFSA be assessed for attachment disorder (including reactive attachment disorder) and sex abuse;

(J)    Order CFSA and its contractors to offer all pre-adoption and post-adoption families adequate services and support to meet the needs of the children and their families;

(K)    Order that all of the individual Defendants and their immediate subordinates (if any) undergo legal training concerning the rights of families and undergo sensitivity training regarding the damage caused to children and families by illegal or unnecessary removals;

(L)    Such other relief as the Court or Jury may find just and appropriate.

*Amended Complaint - page 43*

## <u>JURY DEMAND</u>

The Plaintiffs request that all matters that can be tried by a jury be so tried.


Respectfully submitted,


/s/ John M. Clifford
—————————————————————
John M. Clifford, D.C. Bar No. 191866
Clifford & Garde
1707 L Street, NW, Suite 500
Washington, D.C. 20036
Tel. 202.289.8990


Dated: December 14, 2007