## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBERT AND CARLA DOE, *et al.*,          )
                                          )
      Plaintiffs,                         )
                                          )
v.                                        )  **Civ. No. 05-1060 (TFH)**
                                          )
DISTRICT OF COLUMBIA, *et al.*,          )          **FILED**
                                          )
      Defendants.                         )        AUG 0 1 2013
                                          )
————————————————————————                  )    Clerk, U.S. District and
                                                   Bankruptcy Courts

### MEMORANDUM OPINION

    This case involves the one-day removal of two young children from an abusive home by an agency specifically tasked with protecting abused children.  This removal is the locus of Plaintiffs' myriad constitutional and common law claims and the following motions currently pending before this Court: Defendants' Motion for Judgment on the Pleadings and Motion for Summary Judgment (collectively, "Defendants' Motions for Judgment" or "Defs.' Mots. for J.") [Docket No. 186], Defendants' Motion to Strike Portions of the Declaration of Delores Williams [Docket No. 201], Defendants' Motion to Strike Plaintiffs' Supplemental Memorandum in Response to Questions Raised in Oral Argument [Docket No. 206] and Plaintiffs' Motion for Summary Judgment [Docket No. 182].

    After considering the parties' arguments, submissions, and the entire record herein, the Court finds that, for the reasons below, Defendants' Motion for Judgment on the Pleadings and Motion for Summary Judgment are **granted,** Plaintiffs' Motion for Summary Judgment is **denied**, and Defendants' Motion to Strike Portions of the Declaration of Delores Williams and

Motion to Strike Plaintiffs' Supplemental Memorandum in Response to Questions Raised in Oral Argument are **denied as moot.**

## I.     BACKGROUND

### A.  Factual Background

Plaintiffs Robert and Carla Doe (collectively, "the Does"), individually and as parents and guardians of their minor children, brought this suit against Defendants District of Columbia, former Mayor Fenty, and individually named employees and former employees of the District of Columbia Child and Family Services Agency ("CFSA"): Brenda Donald, Sarah Maxwell, Sandra Jackson, Heather Stowe, Terri Thompson Mallet, Rebekah Philippart, and Daphne King.  The Does' claims arise out of their interactions with CFSA and the agency's removal of their adopted children from their home.  These interactions are described in detail below.

The Does are the adoptive parents of Ann and Oliver Doe and have one biological child, Emma Doe.  In 2001, Robert and Carla adopted Wayne and Sara Doe (collectively, "Twins") after serving as their foster parents.  Pls.' Statement of Material Facts as to Which There is No Genuine Issue ¶ 1 [Docket No. 182-2].[1]  A District of Columbia contractor, Board of Child Care ("BCC"), handled the adoption.  *See* Dep. of Carla Doe at 36:8-16 [Docket No. 191].  Prior to adopting the Twins, Carla Doe knew several unfortunate details about the Twins' lives from "birth to about five years of age." *See id.* at 57:18.  For example, she knew that the Twins did not

---

[1] Pursuant to Rule 7(h) of the Civil Rules of the United States District Court for the District of Columbia, the parties in their motions for summary judgment filed separate statements of material facts as to which they contend there is no genuine issue.  In their opposition motions, each party filed a statement of genuine issues.  Facts that were not controverted by the parties are deemed conceded.

live in a stable home, were hungry and homeless for some time, did not receive appropriate

medical care, had a drug-abusing mother, had been in weekly therapy "for years," and were put

by their mother in "inappropriate situations, unsafe and unhealthy environments for children,"

including "drug environments." *Id.* at 57:5-59:3, 53:8-12. She also knew that at the Twins'

previous foster home ("the Daileys"), their birth mother acted inappropriately with the Twins

during visits. *Id.* at 49:21-50:2.

When the Twins moved into the Doe home, they began to sexually abuse both Ann and

Oliver Doe. Ann stated that the abuse began when she was three. *See* Dep. of Ann Doe [Docket

No. 191-1] at 7:22-8:18. According to Oliver, the abuse began about a month after the Twins

arrived and only ended when the Twins left the house. *See* Dep. of Oliver Doe [Docket No. 191-

2] at 25:1-12. The Does did not learn of the abuse until Sara told Carla Doe that she had

inappropriately touched Oliver at some point a few days before September 27, 2004. *See* Dep. of

Carla Doe at 86:20-22 [Docket No. 191]; Letter Dated Sept. 27, 2004 at 3 [Docket No. 188-2].[2]

On September 27, 2004, the Does sent a letter to CFSA Director, Brenda Donald, and

Adoption Services Program Manager, Sharon Knight, informing CFSA that the Twins had been

abusing Ann and Oliver and requesting support services. *See* Letter Dated Sept. 27, 2004. The

letter stated that Sara was still residing in the Doe home at the time, though at some point she

moved out of the home to live with her maternal grandmother. *See id.* at 3. Wayne had already

been moved out of the home in August or September into a therapeutic respite home with a

provider named Deborah Bobbitt to deal with his anger and other issues. *See id.*; Dep. of Robert

Doe at 88:9-89:16 [Docket No. 191-4].

---

[2] Unless the document cited is a deposition, ECF page numbers are used in citations.

Robert Doe met with several CFSA representatives on October 1, 2004, including Defendant Sandra Jackson, the CFSA Administrator of Permanency and Family Resources Administration, Dr. Tracey Campfield, a CFSA psychologist in the Office of Clinical Practice, and Sharon Knight, the Program Manager for Adoption Services. *Id.* at 102:18-104:4. Also present in the meeting were two therapists from Adoption Attachment Partners who provided therapy for the Doe children and family. *See id.*

Four days later, on October 5, 2004, CFSA received a follow-up letter from Robert Doe. *See* Letter Dated Oct. 4, 2004 [Docket No. 191-7]. That letter stated that the Does could not afford to keep Wayne in his out-of-home placement and Sara's maternal grandmother could not house her much longer. *Id.*

On October 6, 2004, Dr. Campfield called the CFSA hotline to officially report the abuse in the Doe home. *See* CFSA Referral Report [Docket No. 191-8] at 2. Around October 7, 2004, CFSA discussed with Robert Doe their plan for services for the Does, including voluntary placement of Wayne and Sara in therapeutic foster care, as well as CFSA's investigation. *See* Jackson Timeline[3] at 2 [Docket No. 191-5]; Dep. of Robert Doe at 112:2-16 [Docket No. 191-4]; Letter Dated Oct. 14, 2004 [Docket No. 191-11]. CFSA agreed to pay for therapeutic foster care but did not agree to provide transportation and payment for Wayne's therapy with the specific provider he was then seeing because the provider was not an approved service provider. *See* Letter Dated Oct. 14, 2004; Dep. of Sandra Jackson at 68:8-13 [Docket No. 191-6]. According

---

[3] Plaintiffs challenge the admissibility of the timeline, alleging that it is hearsay. It may, however, be admitted as a recorded recollection. Defendant Jackson stated during her deposition that she created the document as a record of the events that took place with the Does case to assist her in reporting to the agency director. *See* Dep. of Sandra Jackson at 11:4-12:4 [Docket No. 191-6]. The timeline was also entered in record evidence as an exhibit to the Deposition, *see id.* at 11:4-9. Moreover, nearly all of the facts contained in the timeline are supported by other undisputed evidence proffered by both Plaintiffs and Defendants.

to CFSA, post-adoption services support was typically available only within the first six months or a year following adoption. *See* Dep. of Brenda Donald at 35:8-18 [Docket No. 191-12].

On October 7, 2004, CFSA Social Worker Delores Williams began her investigation of the Doe home and spoke with Robert, Carla, Ann, and Oliver, following the official hotline report. *See* CFSA Referral Report at 2. On October 8, 2004, Williams participated in a forensic interview with Ann and Oscar at Safe Shores, the District of Columbia Child Advocacy Center, during which Ann and Oliver stated they were both abused by Wayne and Sara, and that Oliver participated in victimizing his younger sister. *See id.* at 12.

Based on her two days of investigation, Williams reported that there were "one or more signs of present danger" to Ann and Oliver Doe and that their risk level was "moderate." *Id.* at 7. However, she did not assess them to be in "immediate danger" because Wayne and Sara were then living outside the home, the Does had installed an alarm system on Ann and Oliver's doors, and the Does had increased supervision of Ann and Oliver. *See id.*

On October 14, 2004, CFSA received another letter from the Does regarding CFSA's offers of assistance. The letter recalled CFSA's offer to place Sara and Wayne in therapeutic foster care and raised several concerns about this offer. *See* Letter Dated Oct. 14, 2004 at 2. The Does requested the agency provide additional services to the Doe family, reminding CFSA that it maintained obligations under the *LaShawn* decree and that it bore responsibility for failing to fully investigate the history of abuse the Twins suffered prior to adoption. *See id.* at 2. The Does proposed that CFSA pay for Sara to attend the Phillips School, a private school that the Does selected, as well as therapy; pay for Wayne to continue to stay with Ms. Bobbit; pay for both Twins' transportation; and pay for family therapy. *See id.*

On October 19, 2004, CFSA called Mr. Doe and informed him that they had safety concerns regarding Ann, Oliver, Sara and Wayne and that he needed to cooperate in placing the children into voluntary care pending further investigation. *See* Dep. of Sandra Jackson at 16:11-16. Mr. Doe agreed to call CFSA back. *See* Dep. of Robert Doe at 136:6-15. The Does' then attorney, Harvey Schweitzer, called CFSA back and proposed alternative plans for Ann and Oliver. *See* Jackson Timeline at 3. Schweitzer also informed Defendant Mallet that CFSA needed a court order to remove the children. *See* Aff. of Harvey Schweitzer ¶ 10 [Docket No. 188-8].

On October 20, 2004, Defendant Brenda Donald, Director of CFSA, determined that Ann, Oliver, and Sara were in immediate danger and needed to be removed from the Doe home. *See* Dep. of Brenda Donald at 60:11-61:10 [Docket No. 191-12]. The following concerns held by the CFSA team motivated this decision:

- The Does' "failure to protect" their children during the four or more years the children abused each other in the Doe home. As a result, CFSA was also concerned that the Does would be unable to properly protect Ann and Oliver even with the safety plan. *See* Dep. of Sandra Jackson at 23:2-3; Dep. of Brenda Donald at 43:1-11; Dep. of Michele Jones-Brigman at 56:4-19 [Docket No. 191-9]; CFSA Referral Form at 12 [Docket No. 191-8].

- The inability of the Does' safety plan to adequately protect the younger children. Dep. of Brenda Donald at 60:21-61:10. Specifically, CFSA was concerned that the plan allowed for the possibility that Ann and Oliver would come back into contact with Sara during unsupervised visits at the grandmother's house. *See id.* at 43:1-44:2.

- CFSA's inability to enforce the plan and ensure that it effectively protected the children. *See* Dep. of Michele Jones-Brigman at 56:4-15.

- The possibility that Sara or Wayne may have to return to live in the Doe home given the financial and practical constraints the Does faced in keeping the Twins outside the home. *See* Dep. of Sandra Jackson at 32:20-33:19; Letter Dated Oct. 4, 2004 [Docket No. 191-7].

- The uncertainty regarding what the Does "knew or didn't know" regarding the abuse, the extent of the Does' involvement in the abuse, and the necessity to separate the children to gather information about this matter. *See* Dep. of Michele Jones-Brigman at 54:5-55:9.

CFSA then spoke with Robert Doe, and the Does agreed that CFSA social workers, rather than police, would remove Ann, Oliver, and Sara for temporary placement. Dep. of Carla Doe at 170:2-171:22 [Docket No. 191]; Dep. of Robert Doe at 155:18-22 [Docket No. 191-4].

On the evening of October 20, 2004, Defendants King and Philippart, CFSA social workers, were assigned to pick up Ann and Oliver. Dep. of Rebekah Philippart at 12:7-13:3 [Docket No. 191-13]. Neither social worker had been involved in the case previously. Both were solely assigned to transport Ann and Oliver and notify the Does of a court hearing the next day. *Id.* at 12:7-14, 15:12-19. Defendants King and Philippart went to the Doe home, picked up the children, and provided notice of a District of Columbia Superior Court Family Court hearing scheduled for the next day. *See* Dep. of Robert Doe at 165:3-9.

Ann and Oliver were taken to a hospital to receive a physical exam. *See* Dep. of Oliver Doe [Docket No. 191-2] at 16:13-17:16; Dep. of Ann Doe at 13:15-14:7; Dep. of Rebekah Philippart [Docket No. 191-13] at 22:11-16. Following the examination, Ann was taken to her maternal grandmother's home, a licensed foster home, and Sara and Oliver were taken to temporary foster homes. *See* Dep. of Ann Doe at 15:14-17; Dep. of Oliver Doe at 17:7-12.

On October 21, 2004, the District decided to "no paper" the neglect charges against Robert and Carla Doe. *See* Dep. of Carla Doe [Docket No. 191] at 183:13-184:7. Ann and Oliver returned home,[4] and the Does agreed to a voluntary placement with CFSA for Sara. *See* Dep. of Robert Doe at 171:15-21. Sara and Wayne were charged with child abuse and taken into custody. *See* Defs.' Resp. to Pls.' Statement of Material Facts as to Which there is No Genuine Issue. [Docket No. 194] at 43. The Twins' were placed on probation and in therapeutic foster

---

[4] Ann went to live with her maternal grandmother and Oliver was returned to his parents. CFSA Referral Form [Docket No. 191-8] at 13.

homes. *See id.* From roughly November 2005 to April 2007, the Twins were under the care of

the Department of Youth Rehabilitation Services. *See id.* at 45.

Ultimately, in May 2007, Robert and Carla Doe relinquished parental rights to the Twins

because, according to Carla Doe, they could not "safely have them in our home" and did not

have "any money for any care of any kind." Dep. of Carla Doe at 216:6-15; *see also*

Relinquishment of Parental Rights Forms [Docket No. 189-15].


### B. Procedural History

On December 14, 2007, the Does filed a 24-count amended complaint against the

defendants, in which they alleged violations of District of Columbia law and the U.S.

Constitution, pursuant to 42 U.S.C. § 1983. On March 7, 2008, this Court narrowed the claims

against the Defendants, dismissing seven counts entirely, parts of four counts, and one plaintiff,

Emma Doe. *See* Order on Defs.' Mot. to Dismiss [Docket No. 37] at 1. The following claims

survived:

- Count II, III, and VII: Procedural Due Process Under the Fifth Amendment Alleging
  Defendants Threatened to Remove and Removed Ann, Oliver, and Sara Doe from their
  Homes

- Count IV: First Amendment Constitutional Violation Against Defendants Walker, Mallet,
  Jackson, Stowe and the District for Alleged Retaliation After Robert and Carla Doe
  Petitioned Defendant District for Assistance

- Count V: First Amendment Constitutional Violation Against Defendants Walker, Mallet,
  Jackson, Stowe and the District for Alleged Retaliation After Robert and Carla Doe
  Raised Concerns Regarding CFSA's Failure to Properly Assess the Twins Prior to their
  Adoption, and For the Need for Comprehensive Post-Adoption Services and Support

- Count VI: Fourth Amendment Constitutional Violation Against All Defendants for
  Allegedly Threatening to Remove and Then Removing Ann, Oliver, and Sara Doe from
  their Homes

- Count X: First Amendment Constitutional Violation Against All Defendants for Allegedly Threatening to Remove and then Removing Ann, Oliver, and Sara Doe from their Homes

- Count XIII: Assault Against All Defendants as to Ann and Oliver Doe

- Count XIV: Battery Against All Defendants as to Ann and Oliver Doe

- Count XV: Intentional Infliction of Emotional Distress Against All Defendants as to All Plaintiffs

- Count XVI: Negligence Against All Defendants as to All Plaintiffs

- Count XVII: Misrepresentation Against All Defendants as to Robert and Carla Doe

- Count XVIII: Malicious Prosecution and Abuse of Process Against All Defendants as to Robert and Carla Doe

- Count XIX: Selective Prosecution of the Twins Against All Defendants as to Robert and Carla Doe

- Count XX: Defamation Against All Defendants As to Robert and Carla Doe

- Count XXI: Invasion of Privacy

- Count XXII: Negligent Hiring and/or Supervision Against the District as to All Plaintiffs

- Count XXIII: Violation of Federal and District Laws in Failing to Provide Timely and Adequate Post-Adoption Services Against Defendant District As to All Plaintiffs

- Count XXIV: Punitive Damages Against All Individually Named Defendants.[5]

After lengthy discovery, on November 8, 2012, Plaintiffs moved for summary judgment and Defendants moved for summary judgment and judgment on the pleadings. Pls.' Mot. for Summ. J. at 1; Defs.' Mots. for J. at 1.[6]

---

[5] Because this Court awards judgment to Defendants on all counts, it need not address the issue of punitive damages, Count XXIV of the Amended Complaint.

[6] Following Plaintiffs' reply to Defendants' brief in opposition to Plaintiffs' motion for summary judgment, Defendants moved to strike portions of Exhibit 1 to Plaintiffs' Reply, *i.e.,* the declaration of Delores Williams. Defs.' Mot. to Strike Portions of the Decl. of Delores Williams that Pls.' Have Used in Supp. of their Reply Br. at 1.  Following oral arguments on these

## II.   STANDARD OF REVIEW

### A.  Judgment on the Pleadings

Pursuant to Fed. R. Civ. P. 12(c), "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." The standard of review for evaluating such a motion is essentially the same as that for a motion to dismiss under Rule 12(b)(6). *Cloonan v. Holder*, 768 F. Supp. 2d 154, 160 (D.D.C. 2011). The Court must "accept as true all of the factual allegations contained in the complaint," *Atherton v. District of Columbia*, 567 F.3d 672, 681 (D.C. Cir. 2009), and allow the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). However, the Court may not "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Id.* That is, the plaintiffs must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B.  Summary Judgment

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of showing that there exist no genuine

---

motions, Plaintiffs filed on April 4, 2013 a "supplemental memorandum in response to questions raised in oral argument." Pls.' Supp. Mem. in Resp. to Questions Raised in Oral Arg. at 1. On April 10, 2013, Defendants moved to strike this memorandum pursuant to Fed. R. Civ. P. 7(b). Defs.' Mot. to Strike Pls.' Supp. Mem. in Resp. to Questions Raised in Oral Arg. at 1.

issue of material fact, after which the non-moving party must in opposition "set forth specific

facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986). To defeat a motion for summary judgment, mere "scintilla of evidence" and

"conclusory, speculative, or not significantly probative" evidence is insufficient. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 249-252 (1986). As the D.C. Circuit has explained:

> The mere existence of *some* alleged factual dispute between the parties" will not defeat
> summary judgment;" the requirement is that there be no *genuine* issue of *material* fact."
> A fact is "material" if a dispute over it might affect the outcome of a suit under governing
> law; factual disputes that are "irrelevant or unnecessary" do not affect the summary
> judgment determination. An issue is "genuine" if "the evidence is such that a reasonable
> jury could return a verdict for the nonmoving party." If there are no genuine issues of
> material fact, the moving party is entitled to judgment as a matter of law if the
> nonmoving party "fails to make a showing sufficient to establish the existence of an
> element essential to that party's case, and on which that party will bear the burden of
> proof at trial.

*Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir 2006) (internal citations omitted).


## III.   ANALYSIS


### A. Plaintiffs' Fourth Amendment Claim (Count VI)

Plaintiffs contend that CFSA's threats to remove and its removal of Ann, Oliver, and Sara

Doe, without "reasonable grounds to believe the children were in danger [and] the removal of the

children . . . was necessary" violated their Fourth Amendment right to be free from unreasonable

government intrusions and seizures. *See* Pls.' Mot. for Summ. J. at 18. This Court disagrees and

awards judgment to Defendants[7] on the Fourth Amendment claim.

---

[7] The Court notes that the defendants had varying levels of involvement in the decision to
remove the children. Only Defendant Donald made the final decision. *See* Dep. of Brenda
Donald [Docket No. 191-12] at 60:11-61:10. Defendants King and Philippart, CFSA social
workers who actually removed the children from their home, were not involved in the removal

The question of whether the seizure of the Doe children was reasonable is an inquiry that must be context specific. *Graham v. Connor,* 490 U.S. 386, 396 (1989) ("The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," and "its proper application requires careful attention to the facts and circumstances of each particular case."). "In the context of removing a child from his home and family, a seizure is reasonable if it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances, meaning that state officers have reason to believe that life or limb is in immediate jeopardy." *Brokaw v. Mercer County*, 235 F.3d 1000, 1010 (7th Cir. 2000). *See also Tenenbaum v. Williams*, 193 F.3d 581, 605 (2d Cir. 1999) ("In emergency circumstances, a child may be taken into custody by a responsible State official without court authorization or parental consent.") (internal citations and quotation marks omitted). In the instant case, Defendants did not obtain a court order prior to removing the children. Defendants instead argue that they had reason to believe that that the children were in immediate danger – that is, exigent circumstances were present and justified the children's removal. *See* Defs.' Reply to Pls.' Opp. to Defs.' Mots. for J. at 3.

The D.C. Circuit has not articulated the requirements of finding "exigent circumstances" in the context of a child's removal from her home. Other circuits, however, have found exigent circumstances to exist when there is "reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat." *Good v. Duaphin County Soc. Servs. for Children and Youth*, 891 F.2d 1087, 1094 (3d Cir. 1989). *See also Wallis v. Spencer*, 202 F.3d 1126, 1140 (9th Cir. 2000) (Requiring "specific, articulable evidence that provides a reasonable cause to believe the child is in imminent danger of abuse" and that

---

decision and were solely assigned to transport Ann and Oliver and notify the Does of a court hearing the next day. Dep. of Rebekah Philippart [Docket No. 191-13] at 12:7-14, 15:12-19

"reasonable avenues of investigation have been pursued"); *Mabe v. San Bernardino Cnty. Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1108 (9th Cir. 2001).  Both parties here also cite to D.C. Code § 16-2309, which provides that a "child may be taken into custody . . . by any employee of the Agency authorized to do so, or a law enforcement officer, when he or she has reasonable grounds to believe that the child is in immediate danger from his or her surroundings and that the removal of the child from his or her surroundings is necessary."  D.C. Code § 16-2309.

The undisputed facts show that Defendants had a number of reasons to believe that the Doe children were in immediate danger in their homes and removing them was necessary. Foremost among these concerns was the fact that four of the Doe children had been sexually abusing each other for at least four years inside the Doe home and the Does' failed to protect against such abuse during this time.  Defs.' Opp. To Pls.' Mot. for Summ. J. at 15; CFSA Referral Form [Docket No. 191-8] at 12.  Against this background, the CFSA team reasonably questioned the information the Does knew about the abuse as well as the Does' ability to properly protect Ann and Oliver even with the safety plan the Does developed.[8]  Dep. of Michele Jones-Brigman at 54:5-55:9;  Dep. of Sandra Jackson at 23:2-3; Dep. of Brenda Donald at 43:1-11; Dep. of Michele Jones-Brigman; CFSA Referral Form at 12.  The CFSA team was also concerned that Sara or Wayne may return to live in the Doe home given the financial and practical constraints the Does faced in keeping the Twins outside the home.  Dep. of Sandra Jackson at 32:20-33:19; Letter Dated Oct. 4, 2004.  CFSA Referral Form at 12; CFSA Referral Form at 12-13.

---

[8] The term "safety plan" refers to the Does' putting alarms on the younger children's doors at night, increasing supervision, and securing outside placements for the Twins, as referred to in Delores Williams' investigative report. *See* CFSA Referral Report [Docket No. 191-8] at 7.

Plaintiffs argue that Defendants did not have reason to believe, at the time of the removal, that the children were in immediate danger and removal was necessary. They rely on the following facts: that Investigative Social Worker Delores Williams' investigation found the safety plan of the Does adequate to protect the children, that the Twins' were outside the home at the time of removal, and that the removal was conducted twenty-two days following the initial letter informing CFSA of the sexual abuse occurring among the children. *See* Pls.' Reply to Defs.' Opp. To Pls.' Mot. for Summ. J. at 6-7.

Plaintiffs' evidence is insufficient to allow a reasonable jury to find that Defendants indeed lacked reasonable belief that the children were immediate harm and removal was necessary. First, while Delores Williams' investigative report did not find the children in "immediate danger," her report did find "one or more signs of present danger" to Ann and Oliver Doe and that their risk level was "moderate." CFSA Referral Report at 7. Her report also revealed that Ann and Oliver were both abused by Wayne and Sara, that Oliver participated in victimizing his younger sister, and that the parents were unaware of this conduct. *Id.* at 9. Moreover, this report was only one piece of the three weeks of meetings, discussion, letter exchanges, and investigation that occurred among Defendants and between Defendants and the Does. *See* Jackson Timeline; *see also Arredondo v. Lockyer*, 462 F.3d 1292, 1300 (10th Cir. 2006) (finding that a child's removal without a pre-deprivation hearing did not violate the parents' due process rights despite one social worker's belief that the child was not in imminent danger). Defendants clearly had other safety concerns for the children beyond Williams' report. *See supra.* Williams' report is therefore insufficient on its own to allow a jury to find for Plaintiffs.

Second, while it was undisputed that the Twins were outside of the home at the time of the removal, the Defendants nonetheless had legitimate concerns regarding the children's safety. For example, Defendants were concerned that the plan allowed for the possibility that Ann and Oliver would come back into contact with Sara during unsupervised visits at the grandmother's house. Dep. of Brenda Donald at 43:1-44:2. In addition, the Does' October 4, 2004 letter suggested a real possibility that the Twins may have to return to live in the Doe home given the financial and practical constraints the Does faced in keeping the Twins outside the home. Dep. of Sandra Jackson at 32:20-33:19; Letter Dated Oct. 4, 2004. CFSA Referral Form at 12; CFSA Referral Form at 12-13. Williams' investigative report also revealed that Oliver was a participant in the abuse of his younger sister, which in light of the four years of abuse the children perpetrated and endured within the Doe home unbeknownst to their parents raised concerns that the Does would be unable to properly protect Ann and Oliver even with the safety plan. Dep. of Sandra Jackson at 23:2-3; Dep. of Brenda Donald at 43:1-11; Dep. of Michele Jones-Brigman; CFSA Referral Form at 12.

Finally, Plaintiffs argue that there was no reason to believe that the children were in immediate danger since Defendants had known of the abuse in the Doe home for twenty-two days prior to initiating removal. Pls.' Reply to Defs.' Opp. To Pls.' Mot. for Summ. J. [Docket No. 199] at 7. For the purposes of Plaintiffs' Fourth Amendment claim, this argument is unsound. The Does cannot demand that CFSA consider various placement options, consult with parents, and carefully deliberate the children's circumstances while also faulting CFSA for not conducting their removal immediately enough when it does conclude from investigation and discussion that the children *are* in immediate danger. *See Tenenbaum*, 193 F.3d at 595 ("[T]he fact that a state official did not act immediately upon a report of abuse, standing alone, proves

nothing."); *Ward v. Murphy*, 330 F. Supp. 2d 83, 92 (D. Conn. 2004) ("a delay between the
report of imminent harm and the actual removal does not deprive the removal of emergent status,
provided that it was objectively reasonable for the case workers to believe that an emergency
existed at the time of removal"). Indeed, prior to the removal of a child in "immediate or
imminent danger," CFSA policy requires the consideration of "a broad range of safety-oriented
responses" as well as "consultation" among various CFSA members. CFSA Procedure U
[Docket No. 189-25] at 1. Examining this evidence as a whole, this Court concludes that no
reasonable jury could find that Defendants lacked reasonable belief that the Doe children were in
immediate danger. Furthermore, even if Defendants erred in their decision or act of removing –
temporarily – the children from their home, the defendants are entitled to qualified immunity, as
discussed further *infra*. This Court therefore awards judgment to Defendants on the Fourth
Amendment claim.

### B. Plaintiffs' Fifth Amendment Claim (Counts II, III, and VII)

Plaintiffs allege that Defendants violated their Fifth Amendment procedural due process
rights by removing Ann, Oliver, and Sara from their home without following the statutory or
administrative procedures required. *See* Am. Compl. Counts II, III, VII [Docket No. 30]; Pls.'
Mot. for Summ. J. [Docket No. 182-1] at 22. However, Plaintiffs fail to offer evidence that
could allow a reasonable jury to find that Defendants violated their procedural due process
rights. Judgment is therefore awarded to Defendants on the Fifth Amendment claim.

To establish a Fifth Amendment violation of procedural due process, an individual must
show: 1) the deprivation by the government 2) of a protected interest in life, liberty, or property

3) without due process of law. *Chamness v. McHugh*, 814 F. Supp. 2d 7, 11 (D.D.C. 2011).

Parents have a constitutionally protected liberty interest in the care, custody and management of

their children. *See Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982). "As a general rule,

therefore, before parents may be deprived of the care, custody, or management of their children

without their consent, due process—ordinarily a court proceeding resulting in an order

permitting removal—must be accorded to them." *Tenenbaum*, 193 F.3d at 593 (2d Cir. 1999)

(citing *Stanley v. Illinois*, 405 U.S. 645, 649 (1972)); *see also Malik v. Arapahoe Cnty. Dept. of

Soc. Servs.*, 191 F.3d 1306, 1315 (10th Cir. 1999) (holding that a parent has a liberty interest in

familial association and privacy that, absent extraordinary circumstances, cannot be violated

without adequate pre-deprivation procedures).

Ordinarily, due process requires that the state provide parents with "predeprivation notice

and a hearing" – that is, notice and an opportunity to be heard *before* state officials remove

children from the home. *Hollingsworth v. Hill*, 110 F.3d 733, 739 (10th Cir. 1997). Given the

state's powerful countervailing interest in protecting children from abuse and neglect, however,

we have long recognized that "'extraordinary circumstances'" may justify the state in

"'postponing the hearing until after the event.'" *Spielman v. Hildebrand*, 873 F.2d 1377, 1385

(10th Cir. 1989) (quoting *Smith v. Org. of Foster Families for Equal. and Reform*, 431 U.S. 816,

848 (1977)). *See also Hollingsworth*, 110 F.3d at 739 ("Removal of children from the custody of

their parents requires pre-deprivation notice and a hearing except for extraordinary situations

where some valid governmental interest is at stake that justified postponing the hearing until

after the event"). Such extraordinary circumstances, as described *supra*, include when children

are faced with imminent harm. *Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir. 1983) ("When

a child's safety is threatened, that is justification . . . for action first and hearing afterward."); *see*

*also Mabe*, 237 F.3d at 1106; *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1020 (7th Cir.2000);

*Tenenbaum*, 193 F.3d at 593-94; *Hollingsworth* 110 F.3d at 739; *Jordan by Jordan v. Jackson*,

15 F.3d 333, 346 (4th Cir.1994).  By limiting warrantless removals to true emergencies, the law

"seeks to strike a balance among the rights and interests of parents, children, and the State."

*Tenenbaum*, 193 F.3d at 594.

There is no doubt that the Doe children were repeatedly sexually molested in the Doe

household without their parents' knowledge for at least four years.  It is also undisputed that

CFSA has duty to investigate reports of child abuse.  *District of Columbia v. Harris*, 770 A.2d 82

(D.C. 2001) ("When abused and neglected children have been individually identified to the

government agency charged with their protection, then a duty, although narrow and specific, is

created by statute to benefit the individually identified persons.").  CFSA was expressly created

to receive and respond to reports of child abuse, remove children from their homes if necessary,

investigate child abuse cases, and protect children who have been abused "from further

experiences and conditions detrimental to their healthy growth and development."  D.C. Code §

4-1303.01a(b)(3), (4), (5), and (8).  *See also* D.C. Code § 4-1301.04(a) (providing that "[t]he

Agency shall conduct a thorough investigation of a report of suspected child abuse or neglect to

protect the health and safety of the child or child.").

In light of this background, the question before this Court is whether Defendants were

faced with "exigent circumstances" that would excuse them from obtaining a court order or pre-

deprivation hearing prior to the removal of the children.  As discussed *supra* in the context of

Plaintiffs' Fourth Amendment claim, Defendants had several reasons to believe that the children

were in immediate danger, all of which were reasonable for an agency charged explicitly with

the protection of abused children.  As a result, this Court concludes that no reasonable jury could

18

find that these Defendants lacked reasonable belief that children were in immediate danger at the time of the removal. As such, Defendants' failure to provide a court order for the removal of the children or arrange a pre-deprivation hearing does not constitute a Fifth Amendment violation. Defendants provided Plaintiffs with a Notice to Appear in D.C. Superior Court regarding the charges of neglect against them, thereby providing both notice and a post-deprivation remedy. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("[t]he fundamental requirement of due process is [notice and] the opportunity to be heard at a meaningful time and in a meaningful manner, before the government deprives an individual of property" (internal citations omitted); *Hudson v. Palmer*, 468 U.S. 517, 532-33 (1984) ("[U]nauthorized intentional deprivation of property by a state employee does not constitute a violation of [due process] if a meaningful post-deprivation remedy for the loss is available.").

Plaintiffs mistakenly argue that "D.C. law requires a CFSA official to have a court order to take children into custody, unless she has reasonable grounds to believe the child is in immediate danger and no other safety-oriented responses are viable" at the time of the removal. *See* Pls.' Opp. [Docket No. 193] at 3. The provision that Plaintiffs cite, D.C. Code § 16-2309(a)(3), actually states: "A child may be taken into custody . . . by a law enforcement officer when he or she has reasonable grounds to believe that the child is in immediate danger from his or her surroundings and that the removal of the child from his or her surrounds is necessary." D.C. Code § 16-2309(a)(3). D.C. law does not require that CFSA officials exhaust viable safety-oriented responses before removing a child in immediate danger without a court order. Rather, it is CFSA *policy* that states that "the Investigations Worker *shall consider* a broad range of safety-oriented responses" prior to removal. CFSA Procedure U at 1 (emphasis added). Regardless, the undisputed facts in this case demonstrate that Defendants did consider alternatives to removal,

19

holding meetings and phone calls with the Does to discuss such alternatives, and asking the Does to voluntarily place the children in foster care prior to the removal to better assist them. *See* CFSA Referral Report at 12 ("There had been many discussions with the family suggesting that in order for the agency to assit [sic] the family and provide the needed services, that the parents needed to voluntarily place the children in care under a 21 day voluntary placement agreement."). The Court also notes that the total length of time the children were removed from their home was under twenty-four hours. *Id.* at 13. The day after the removal, Ann and Oliver returned to their maternal grandmother and parents, respectively, while the Does agreed to have Sara placed in temporary foster care. *Id.*[9]

Since Plaintiffs have failed to offer evidence that could allow a reasonable jury to find that Defendants, in this process, lacked reasonable belief that the children were in immediate harm and removal was necessary, judgment is awarded to Defendants on the Fifth Amendment claim.[10]

## C. Plaintiffs' First Amendment claims (Counts IV, V, and X)[11]

Plaintiffs contend that Defendants violated their First Amendment rights by retaliating against them for petitioning the CFSA and DYRS for assistance, and for raising concerns about the CFSA's failure to assess the Twins prior to adoption and the CFSA's obligations under

---

[9] The Court also concludes that the prosecutor's decision to "no-paper" the case does not render Defendants' decision to temporarily remove the children unreasonable at the time it was made. *See, e.g., Doe v. Kearney*, 329 F.3d 1286, 1299 (11th Cir. 2003) (finding a social worker's temporary removal of children did not violate the Constitution after she received documented reports of sexual abuse within the family, even though a state judge found no probable cause to keep the children from their parents and ordered their immediate return the following day).

[10] Defendants are also awarded judgment on qualified immunity grounds, discussed *infra.*

[11] Plaintiffs' Count X includes a right to privacy claim under the First Amendment that will be analyzed with their common law right to privacy claim (Count XXI), *infra.*

District and federal law and this Court's orders in *LaShawn* (Counts IV and V).  This alleged

retaliation took the form of CFSA threatening to remove the children, CFSA removing the

children, and CFSA and DYRS forcing the Does to relinquish parental rights to Sara and Wayne.

In order to prove a claim for retaliation, a plaintiff must establish the following elements:

(1) the plaintiff was engaged in conduct protected under the First Amendment, (2) the defendant

took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's

position from speaking again; and (3) a causal link between exercising a constitutional right and

the adverse action taken against him.  *Aref v. Holder*, 774 F. Supp. 2d 147, 169 (D.D.C. 2011).

Plaintiffs contend they engaged in the following protected activities: (1) requesting

assistance from CFSA, (2) raising concerns about CFSA's evaluation and care of Wayne and

Sara, (3) demanding that agency officials provide adequate services for their children, (4)

objecting to offers of inadequate services or assistance, (5) objecting to the interview process at

the Children's Advocacy Center, and (6) raising concerns about the planning, security, and care

of their children at DYRS.  *See* Pls.' Mot. for Summ. J. at 25-28; Am. Compl. ¶¶ 165-170.

Defendants contest that Plaintiffs' activities were not protected under the First Amendment

because they were private requests for assistance and did not touch on a matter of public

concern.  *See* Defs.' Mots. for J. at 19.

Regarding the second and third elements of retaliation claim, Plaintiffs contend that

defendants committed several retaliatory actions, including (1) threatening to remove and

removing the children from the Doe home, (2) falsely charging Robert and Carla Doe with

sexually abusing their children, (3) initiating juvenile charges against the Twins, (4) removing

DYRS services and CFSA support, and (5) forcing Robert and Carla Doe to relinquish their

parental rights to Wayne and Sara.  *See* Pls.' Mot. for Summ. J. at 24-27.

It is unnecessary for this Court to determine whether the Does' activities were "protected" under the First Amendment and whether Defendants' actions "would likely chill a person of ordinary firmness from continuing to engage in [protected] activity," *Jenkins*, 513 F.3d at 587, because Plaintiffs fail to establish the third element of a retaliation claim, *i.e.*, Plaintiffs cannot show a nexus between their protected activities and these allegedly retaliatory actions.

As discussed *supra* in the context of Fourth and Fifth Amendment claims, Plaintiffs fail to provide evidence that would allow a reasonable jury to find that the removal of the children was unreasonable and therefore unlawful. Moreover, the undisputed facts show that CFSA did not remove the children (or engage in any allegedly retaliatory action) until after Plaintiffs informed CFSA that the Twins had sexually abused Ann and Oliver and after CFSA found that the abuse had been going on for years. There is also no evidence that the juvenile charges against the Twins or DYRS' decision to terminate services were retaliatory, that any of the individual Defendants were involved in DYRS' decision, or that Defendants "forced" the Does to relinquish custody of Sara and Wayne in May 2007. Plaintiffs' evidence of alleged retaliation consists only of the deposition testimony of Mary Phillips, DYRS Special Assistant, and a letter from then-DYRS Director Vincent Schiraldi, neither of which provides a retaliatory explanation for Defendants' actions. Ms. Phillips's deposition testimony in fact outlines a completely non-retaliatory reason for why DYRS's services were terminated[12] and Mr. Schiraldi's letter does not discuss Plaintiffs' request for services or why services were terminated, instead focusing on the

---

[12] Special Assistant Phillips explained that she decided to close the Twins' juvenile cases and terminate DYRS services:

> [b]ecause we had provided the services and because the children were not appropriately committed to us. And the only reason that they were committed was that we were basically bankrolling their housing because the parents wouldn't allow them to come home. They had actually been on probation, were succeeding on probation, and under normal circumstances, never would have been committed.

Dep. of Mary Phillips [Docket No. 182-15] at 8-16.

preparation for the Twins' placement following "the anticipated relinquishment of parental rights." Letter from Vincent Schiraldi to Judge Saddler [Docket No. 189-28] at 1. Without evidence showing that Defendants' actions were retaliatory or even causally linked to Plaintiffs' protected actions, judgment must be rendered to Defendants on Counts IV and V.

### D. Plaintiffs' Assault and Battery Claims (Counts XIII and XIV)[13]

Plaintiffs allege that all Defendants assaulted and battered Ann and Oliver when Defendants "intentionally and unlawfully caused [Ann and Oliver to] apprehen[d] imminent physical harm" and "intentionally and unlawfully touched and restrained Ann and Oliver without their parents [sic] consent." *See* Am. Compl. ¶¶ 194, 196. Plaintiffs, however, do not proffer evidence to satisfy the elements of assault and battery. An assault is "an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim." *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (1993) (internal citations omitted). That is to say, an "[a]ssault results from apprehension of imminent harmful or offensive contact, in contrast to contact itself." *Id*. In contrast, "[a] battery is harmful or offensive contact with a person, resulting from an act intended to cause [that person] . . . to suffer such a contact." *Pearson v. Children's Hosp. Nat'l Med. Ctr.*, 562 A.2d 648, 650 (D.C. 1989). Plaintiffs fail to offer sufficient evidence to prove either.

Plaintiffs allege in their Opposition Brief that the assault and battery took place when Defendants Philippart and King physically removed the children (allegedly against their parents' wishes) and took them for medical examinations. Pls.' Opp. to Defs.' Mots. for J. [Docket No.

---

[13] The Court finds that most of Plaintiffs' remaining claims are thinly supported. It seems that Plaintiffs have adopted the "see what sticks" approach that is becoming sadly typical of litigation today by including all conceivable arguments regardless of their strength, yet weakening their overall case as a result.

193] at 25-26.  Plaintiffs offer no evidence to suggest that any of the remaining Defendants attempted to do physical harm or physically contacted Ann and Oliver Doe in any way.  With regards to Defendants Philippart and King, who removed the Doe children, Plaintiffs do not offer proof that these particular defendants in fact intentionally caused the children to apprehend imminent harm or made intentionally harmful or offensive contact with the children.  In fact, Plaintiffs' Complaint fails to describe how the assault and battery occurred.  *See* Am. Compl. ¶¶ 194, 196.  Defendants Philippart and King were acting in within their lawful authority, believing that their superiors had found the children to be in immediate harm and had decided to remove the children as CFSA was authorized to do, *see* §§ 4-1301.04(b), 4-1303.01a, and 4-1301.06. Defendants Philippart and King thus removed the children as instructed.  *See* Dep. of Rebekah Philippart at 23:18-24:18.  They played no part in the investigation or removal decision, *see id.*, and are also protected by qualified immunity.  *See infra* discussion on qualified immunity.[14] Since Plaintiffs do not plead sufficient facts to allow a jury to reasonably find in their favor, judgment is granted in favor of Defendants on the assault and battery claims.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

---

[14] Further, there is absolutely no evidence – nor do Plaintiffs allege – that Defendants Philippart and King (or any of the other Defendants) used unreasonable force to remove the children. *See, e.g., Magwood v. Giddings*, 672 A.2d 1083, 1086 (1996) ("If a person detains another with the authority of law he cannot be liable in tort for the reasonable exercise of that authority."). Additionally, CFSA policy required, as part of the removal process, a medical examination of the children. *See* CFSA Procedure U at 1.  Plaintiffs offer no proof that any of the named Defendants conducted the routine medical examinations on the children following their removal.  Plaintiffs also offer no facts to support that the routine medical examinations that Ann and Oliver underwent constituted intentionally harmful or offensive contact or intentionally caused the children apprehension of imminent harm. *See* Am. Compl. ¶¶ 193-196.

### E. Plaintiffs' Intentional Infliction of Emotion Distress Claim (Count XV)

Plaintiffs also fall well short of adequately pleading their claim of Intentional Infliction of

Emotional Distress ("IIED").  To succeed on the claim of Intentional Infliction of Emotional

Distress ("IIED"), a plaintiff must show "(1) extreme and outrageous conduct on the part of the

defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress."

*Sere v. Grp. Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982) (internal citations omitted); *see*

*also District of Columbia v. Tulin*, 994 A.2d 788, 800 (D.C. 2010).  Plaintiffs allege that the acts

of all defendants "were extreme, outrageous, and intentional, and/or undertaken in reckless

disregard and deliberate indifference to the consequences and impacts those acts would have on

the Plaintiffs."  Am. Compl. at ¶ 198.  While Plaintiffs' complaint contains no specific

information about what these acts actually were and how they satisfy the elements of an IIED

claim, Plaintiffs specify in their Motion for Summary Judgment the following acts as "extreme

and outrageous conduct" on the part of Defendants:

> (1) took action to try and disrupt their legal representation; (2) threatened Carla and
>
> Robert with arrest if they didn't allow the Defendants to take their children; (3) fraudulently claimed there was some immediate danger that required the Doe children to be removed; (4) filed false complaints stating that Carla and Robert had been involved in sexually abusing their children; (5) charged the Twins as criminals instead of providing them with comprehensive services; (6) cut off the modest services that were provided; (7) retaliated against the Does when they raised concerns about the timing or adequacy of services for the Twins; (8) further retaliated by cutting off services for the Twins and forcing the Does to relinquish their parental rights resulting in the Twins returning to the custody of CFSA.

Pls.' Mot. for Summ. J. at 28.  While Plaintiffs repeatedly make the conclusory statement that

these actions rise to the level of "extreme and outrageous" under District of Columbia law, *see*

*id.* at 27-29, they offer no legal support for this assertion.  The only case Plaintiffs cite is *Park v.*

*Hyatt Corp.*, in which the court concluded "repeated acts of discrimination and racially

25

motivated sabotage" could amount to extreme and outrageous conduct. *See* 436 F. Supp. 2d 60,

65 (D.D.C. 2006). As Plaintiffs' IIED claim is not grounded on any racially motivated

discrimination by Defendants, *Park* offers no support for their claim.

Rather, as the D.C. Court of Appeals has made clear, "to be actionable, the conduct must

be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bound of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"

*Tulin*, 994 A.2d at 800. A reasonable jury could not find that Defendants' alleged conduct rose

to the level of "extreme and outrageous." As described in more detail *supra*,[15] Defendants were

statutorily obliged to investigate and respond to reports of sexual abuse. *See* D.C. Code § 4-

1301.04(a)(1). Once Defendants received information that the Doe children had been abusing

each other for nearly four years within the Doe home, they were required to act to protect the

children. Moreover, Defendants had several reasonable concerns for the safety of the children

that motivated the temporary removal of the children, who were returned within twenty-four

hours. Such conduct certainly does not rise to the level of "outrageous." *Homan v. Goyal*, 711

A.2d 812, 818 (D.C. 1998) (holding that liability for IIED will not attach to "mere insults,

indignities, threats, annoyances, petty oppressions, or other trivialities.").[16] As such, judgment is

awarded to Defendants on the IIED claim.

---

[15] *See* discussion on Fourth and Fifth Amendment claims *supra*.

[16] Plaintiffs also fail to offer proof that they meet the level of "severe emotional distress"
required for an IIED claim. To meet this requirement, "the defendant's actions must proximately
cause the plaintiff emotional distress 'of so acute a nature that harmful physical consequences
might be not unlikely to result.'" *Kotsch v. District of Columbia*, 924 A.2d 1040, 1046 (D.C.
2009) (internal quotation marks omitted). "[M]ental anguish" and "stress" are
insufficient. *Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 808 (D.C. 2003); *see
also Kitt v. Capital Concerts*, 742 A.2d 856, 861-62 (D.C. 1999) ("angst, sleeplessness, and
humiliation" is not "greater [discomfort] than a reasonable person could be expected to
tolerate"). Here, Plaintiffs allege that they suffered and will suffer "anxiety, pain, post-traumatic

**F. Plaintiffs' Negligence and Negligent Hiring and Supervision Claims (Counts XVI and XXII)**

Plaintiffs seek to hold the individually named Defendants liable for negligence and the District liable for negligent hiring and supervision. Plaintiffs claim that Defendants were negligent in their assessment of the Twins when they were placed in foster care, during the investigation of abuse among the Doe children, and in their response to Plaintiffs' requests for services. *See* Am. Compl. ¶ 30; Pls.' Opp. to Defs.' Mots. for J. [Docket No. 193] at 29-31. To prove negligence, Plaintiffs must show three elements: (1) "a duty of care owed by the defendant to the plaintiff," (2) "a breach of that duty by the defendant," and (3) "damage to the interests of the plaintiff, proximately caused by the breach." *District of Columbia v. Cooper*, 483 A.2d 317, 321 (D.C. 1984); *Pannell v. District of Columbia*, 829 A.2d 474, 479 (D.C. 2003). This Court award Defendants summary judgment on Counts XVI and XXII because there is "an absence of proof on one or more essential elements" of Plaintiffs' negligence claims. *Mixon v. Wash. Metro. Area Transit Auth.*, 959 A.2d 55, 57 (D.C. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

First, it is at best unclear what standard of care Defendants owed to Plaintiffs. Defendants correctly argue that expert testimony is necessary to determine the standard of care owed because "the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson." *See District of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C. 1982). Plaintiffs' argument that D.C. Code § 16-307 establishes the appropriate standard of care and obviates the need for expert testimony, *see* Pls.'

stress, humiliation, fear, and other damages" and thus cannot sustain a claim for IIED. *See* Am. Compl. ¶ 198.

Opp. [Docket No.193] at 30, is misplaced. That statute governs adoption proceedings, which are only one of Plaintiffs' claims. With regards to the adoption proceedings, Plaintiffs do not demonstrate what duty of care was owed to them by CFSA when the Board of Child Care, a contractor, handled the adoption of the Twins. Indeed, according to Carla Doe, she did not speak to anyone from CFSA during the adoption process. *See* Dep. of Carla Doe at 64:5-17. Plaintiffs put forth an adoption status report from the Board of Child Care with a signature line for the former Director of CFSA to show that CFSA was involved in the adoption of the Twins. *See* BCC Status Report [Docket No. 189-24] at 5. This document does not show that any of the named Defendants were involved in the adoption, much less the standard of care CFSA owed to the Does during this process or that the Defendants violated the provisions of § 16-307.[17]

Second, though Plaintiffs aver that Defendants were negligent in how they responded to the Does' requests for services, Plaintiffs fail to offer proof that Defendants breached the duty of care owed to Plaintiffs. Defendants rightly argue that the Plaintiffs' negligence claims deal with issues that are beyond the understanding and knowledge of the average juror. These issues include what factors CFSA must consider when deciding what services to provide and in what

---

[17] Moreover, even if Defendants were involved in the adoption process and there was a clear standard of care governing this process, Plaintiffs offer insufficient proof that Defendants' allegedly withholding information about the Twins' history violated a duty of care. It is undisputed that BCC handled the adoption. It is also undisputed that Plaintiffs knew several aspects of the Twins' history prior to their placement as foster children in the Doe home, *e.g.*, that the Twins were often hungry and homeless, did not receive appropriate medical care, had a drug-abusing mother, had been in weekly therapy "for years," and were put by their mother in "inappropriate situations, unsafe and unhealthy environments for children," including "drug environments." *Id.* at 57:5-59:3, 53:8-12. She also knew that at the Twins' previous foster home ("the Daileys"), their birth mother acted inappropriately with the Twins during visits. *Id.* at 49:21-50:2. Given what Plaintiffs already knew about the Twins, it is unclear what material facts the additional information would have provided and whether this would have altered the Does' decision to adopt the Twins. Plaintiffs therefore fail to show that not having the additional information about the Twins' history (which Defendants allegedly failed to disclose) proximately caused them injury.

time frame and how to assess the reasonableness of a family's requested services, particularly in light of the numerous requests made by various families in need. Plaintiffs themselves acknowledge that they have received numerous services from CFSA, including "(a) monthly adoption stipends that vary in amount from year to year; (b) funds for therapy from the crime victims fund; (c) therapy services from the Superior Court Child Guidance Clinic; (d) funds for a therapeutic summer camp during one summer for Wayne Doe; and (e) various services provided by District contractor First Home Care [and] a monthly adoption subsidy to offset some of the costs of the children's living expenses." *See* Pls.' Ans. to the Defs.' Interrogatories Nos. 5 and 6 [Docket No. 191-17]. Yet Plaintiffs put forth no evidence showing that this level of services deviates from the standard of care CFSA owes to them. Plaintiffs further fail to show that their requests, including a private boarding school, transportation, and therapy with a non-agency provider, are reasonable requests given the standard of care owed. *See* Letter Dated Oct. 14, 2004 [Docket No. 191-11] at 2-3.

Third, Plaintiffs have not presented any evidence to prove its negligent hiring and supervision claim. "To invoke theory of liability based on negligent hiring or supervision, a party must show that the employer knew or should have known that its employee behaved in dangerous or otherwise incompetent manner, and that employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *See Giles v. Shell Oil Corp.*, 487 A.2d 610 (D.C. 1985). Plaintiffs offer no facts illustrating that the District failed to properly make hiring decisions, that any employee behaved incompetently, that the District failed to adequately supervised its staff, and that this negligence proximately caused them harm. *See* Am. Compl. ¶¶ 199-200. Judgment is therefore awarded to Defendants on the negligence and negligent supervision claims.

### G. Plaintiffs' Misrepresentation Claim (Count XVII)

Plaintiffs allege that Defendants made false statements or omissions of fact concerning the overall health and family history of the Twins in violation of Defendants' duty of reasonable care. According to Plaintiffs, "these false statements or omissions were detrimentally relied upon by Robert and Carla Doe when they adopted and sought therapy for the Twins." Am. Compl. ¶ 202. Plaintiffs' misrepresentation claim fails for three reasons.

First, Plaintiffs' claim is procedurally barred. It is undisputed that Plaintiffs Robert and Carla Doe became foster parents of the Twins in 2000, and adopted the Twins in 2001. Yet, they filed this cause of action against the Defendants on May 27, 2005, well over the three year statute of limitations under D.C. law. *See* D.C. Code § 12-301(8) (prescribing three years for a cause of action for which a limitation is not otherwise specifically prescribed). Plaintiffs concede this point by not challenging it.[18]

Second, Plaintiffs present no evidence that any of the named Defendants or any District employee was involved in the Twins' adoption proceedings. It is undisputed that Plaintiffs worked with the Board of Child Care during the adoption process. Indeed, according to Carla

---

[18] Plaintiffs have also failed to comply with the mandatory notice requirement of D.C. Code § 12-309, which provides:

> An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage.

D.C. Code § 12-309. The District of Columbia Court of Appeals has held that this provision must be narrowly construed against claimants. *See, e.g., Snowder v. District of Columbia*, 949 A.2d 590, 600 (D.C. 2008); *District of Columbia v. Dunmore*, 662 A.2d 1356, 1359 (D.C. 1995). Since the alleged misrepresentation occurred in March 2000, more than six months prior to the date of the letters of notice Plaintiffs sent to the District on February 22, 2005 and April 26, 2005, Plaintiffs failed to provide adequate notice for their misrepresentation claim.[18]

Doe, she did not speak to anyone from CFSA during the adoption process. *See* Dep. of Carla

Doe [Docket No. 191] at 64:5-17. Plaintiffs put forth an adoption status report from the Board of

Child Care with a signature line for the former Director of CFSA to show that CFSA was

involved in the adoption of the Twins. *See* BCC Status Report [Docket No. 189-24] at 5. This

document does not show that any of the named Defendants were involved in the adoption.

Third, even if Defendants were involved in the adoption process, Plaintiffs do not offer

sufficient evidence to establish a claim for negligent misrepresentation under D.C. law. To

establish such a claim, Plaintiffs must show that

> (1) the defendant made a false statement or omission of a fact;

> (2) the statement was in violation of a duty to exercise reasonable care;

> (3) the false statement or omission involved a material issue;

> (4) the plaintiff reasonably relied to his detriment on the false information, and

> (5) the defendant's challenged conduct proximately caused injury to the plaintiff.

*Burlington Ins. Co. v. Okie Dokie, Inc.*, 398 F. Supp. 2d 147, 154 (D.D.C. 2005). Plaintiffs do

not specify what information Defendants knew and failed to disclose regarding the Twins'

history. Plaintiffs allude to "false statement and omissions of facts" made prior to adoption and

to "records in [Defendant District's] possession" but do not elaborate what these records include.

Pls.' Opp. to Defs.' Mots. for J. at 32. Plaintiffs also do not describe what duty Defendants owed

to Plaintiffs during the adoption proceedings or how this duty was violated. *See generally id.*

Even if Plaintiffs could establish the first four elements of a negligent misrepresentation

claim, they do not offer evidence that the allegedly false statements and omissions of fact

proximately caused them injury. While Plaintiffs claim that they would not have adopted the

Twins had they known the omitted information, *see id.* at 33, it is undisputed that Plaintiffs knew

several aspects of the Twins' history prior to their placement as foster children in the Doe home. *See supra* text accompanying note 16. Plaintiffs fail to demonstrate that the omitted information was materially different than the information they already knew about the Twins and therefore proximately caused Plaintiffs injury. As no reasonable juror could find for Plaintiffs on their negligent misrepresentation claim, judgment is awarded to Defendants.

### H. Plaintiffs' Malicious Prosecution and Abuse of Process Claims as to Robert and Carla Doe (Count XVIII)

Plaintiffs claim that Defendants acted "with malicious intent in planning and initiating" a child abuse and neglect proceeding against Robert and Carla Doe. *See* Am. Compl. ¶ 204. Plaintiffs have conceded Defendants' arguments on the malicious prosecution claim by failing to address them in their opposition brief. *See generally* Pls.' Opp. [Docket No. 193]. *See Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C.2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.") (citing *FDIC v. Bender*, 127 F.3d 58, 67–68 (D.C. Cir. 1997).[19]

---

[19] Substantively, Plaintiffs cannot show that they suffered any "special injury" as a result of their abuse and neglect proceeding. *Tri-State Hosp. Supply Corp. v. United States*, 2007 U.S. Dist. LEXIS 48609 at *15 (D.D.C. 2007) (citing *Weisman v. Middleton*, 390 A.2d 996, 1000 (D.C. 1978)) ("in order to prevail on a malicious prosecution claim, the plaintiff must prove special injury, that is, some injury which would not necessarily occur in all suits prosecuted for similar causes of action."). Incurring substantial expense in defending against a lawsuit does not reach the level of special injury. *Id.* at *19. Plaintiffs have neither pled nor offered proof of any special injury as a result of the abuse and neglect complaint filed against them, after which the case was never called and the charges were no-papered. *See* Defs.' Mots. for J. at 13; Pls.' Mot. for Summ. J. at 6.

Plaintiffs' abuse of process claim also fails as a matter of law.  "The essence of the tort of abuse of process is the use of the legal system to accomplish some end which is without the regular purview of the process, or which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be required to do." *Scott v. District of Columbia*, 101 F.3d 748, 755 (D.C. Cir. 1996) (internal citations omitted).  As the D.C. Circuit has explained:

> For abuse of process to occur there must be use of the process for an immediate purpose other than that for which it was designed and intended. The usual case of abuse of process is one of some form of extortion, using the process to put pressure upon the other to compel him to pay a different debt or to take some other action or refrain from it. *Id.* at 755-56.

Plaintiffs have failed to offer any proof that the legal system was used to accomplish an unintended end.  Though they allege that Defendants used the legal process to "remove the Does' adopted children from their care in order to retaliate against them," *see* Pls.' Opp. Mot. at 34, they offer little proof to substantiate this allegation.  Instead, Plaintiffs make several conclusory statements about Defendants having "absolutely no basis" to remove the children and any concerns the Defendants had were "vague." *Id.* at 35.  Other than their conclusory allegations, Plaintiffs do not put forward evidence that could substantiate their abuse of process claim against the Defendants.[20]  As such, judgment is awarded to Defendants on both the malicious prosecution and abuse of process claims.

---

[20] Plaintiffs make much of the complaint forms listing Robert and Carla Does' names under the "alleged abuser" line of the abuse and neglect complaint form, but they fail to reconcile this with the fact that the Does do not appear anywhere in the statement of facts section of the form (where the sexual activity between the children is described as the reason for removal) and that the case was no-papered and never called. *See* Defs.' Mots. for J. at 13; Pls.' Mot. for Summ. J. at 6.

### I.  Plaintiffs' Defamation Claim (Count XX)

Plaintiffs claim that "the false charges of abuse and the removal of several of the children from their home without cause or legal basis has placed [them] in a false light in the legal community and with the public at large." Am. Compl. ¶ 208.  However, Plaintiffs concede their defamation claim since they fail to respond to Defendants' arguments regarding this claim in their opposition brief.  *See* Pls.' Opp. to Defs.' Mots. for J. [Docket No. 193].  *See Hopkins*, 284 F. Supp. 2d at 25 (D.D.C. 2003).  Plaintiffs also fail to offer proof sufficient to establish a defamation claim.  The charges of abuse against the Does, which were eventually no-papered, cannot support a defamation claim because they are statements incidental to judicial proceedings and are therefore absolutely privileged.  *Manzanderan v. McGranery*, 490 A.2d 180, 181 (D.C. 1984) ("It is well-settled that defamatory statements published incidental to judicial proceedings are absolutely privileged, providing the statements are relevant to the proceeding.").  Further, the removal of the Doe children from their home is not a "statement" that can sustain a defamation claim.  As such, judgment is awarded to Defendants on the defamation claim.

### J.  Plaintiffs' Selective Prosecution of the Twins Claim (Count XIX)

Plaintiffs allege that Defendants selectively prosecuted the Twins, since "[o]ther similarly situated children are not prosecuted for such offenses, particularly when the children are subjects of open abuse or neglect cases." Am. Compl. at 39.  Plaintiffs have conceded their selective prosecution claim by failing to address Defendants' arguments in their opposition brief.  *See* Pls.' Opp.  *See Hopkins*, 284 F. Supp. 2d at 25.  Plaintiffs also lack standing to assert claims on the behalf of Wayne and Sara Doe, over whom the Does forfeited parental rights in 2007 and who are not plaintiffs in this litigation.  *See* Am. Compl. at ¶ 6; *see also King v. District of Columbia*,

878 F. Supp. 2d 8 (D.D.C. 2012) ("[u]nder D.C. law [only] a *custodial* parent may bring a next

friend suit . . . , and plaintiffs have not produced any authority indicating that the non-custodial

parent may sue as next friend."); *see also Elk Grove*, 542 U.S. at 17 (denying non-custodial

father right to bring suit on child's behalf).  Finally, selective prosecution claims are based on

constitutional equal protection standards, *see, e.g.*, *United States v. Armstrong*, 517 U.S. 456,

465 (1996), and all equal protection claims were dismissed in this Court's March 7, 2008 order.

*See* Order Granting in Part and Den. in Part Defs.' Mot. to Dismiss [Docket No. 37].  Therefore,

this Court awards judgment to Defendants on the selective prosecution claim.


### K.  Plaintiffs' Invasion of Privacy (Count XXI)

Plaintiffs' invasion of privacy claim also fails as a matter of law.  Plaintiffs claim that

Defendants violated their right to privacy when Defendants entered their home to remove Ann

and Oliver on October 20, 2004.  The D.C. Circuit has only "approve[d] the extension of the tort

of invasion of privacy to instances of intrusion, whether by physical trespass or not, into spheres

from which an ordinary man in a plaintiff's position could *reasonably* expect that the particular

defendant should be excluded."  *Pearson v. Dodd*, 410 F.2d 701, 704 (D.C. Cir. 1969) (emphasis

added).  The issue before the Court is thus whether an ordinary person in Plaintiffs' position

could reasonably expect that Defendants should have been excluded from his or her home on

October 20, 2004.  This Court finds the answer to this question to be no and awards Defendants

summary judgment on this issue.

As explained *supra*, Defendants had reasonable belief that the children were in immediate danger.[21]  Duty bound to investigate reports of child abuse, *see* D.C. Code § 4-1301.04(a)-(b), Defendants had learned that the Doe children had been sexually abusing each other for nearly four years within the Doe home.[22]  Defendants had a series of concerns that led to their reasonable belief that the children were in immediate harm.  *See supra* discussion on Fourth Amendment claim.  Plaintiffs claim that Defendants' concerns are "post hoc excuses" and "shifting explanations" that were never shared with them.  Pls. Opp. Mot. at 4.  Yet Plaintiffs' evidence to support these claims is slim.  The Complaint Referral Form Plaintiffs' cite reveals that the children were removed in response to the prolonged period of sexual abuse that was taking place among the children.  *See* Removal Complaint Form [Docket No. 188-16] at 2.  It is also clear that Carla Doe knew that CFSA did find the children to be in imminent harm and thus removed them. *See* Dep. of Carla Doe at 172:2-16 ("It was my understanding that CFSA thought they were in imminent danger somehow, and that's why they were coming.").

Against this background, an ordinary person in Plaintiffs' position could not have reasonably expected that Defendants should be excluded from their home.  *Georgia v. Randolph*, 547 U.S. 103, 118-19 (2006) ("the question whether the police might lawfully enter over

---

[21] *See* discussion *supra* on Plaintiffs' Fourth and Fifth Amendment claims.  The Court also notes that prior to the children's removal, CFSA spoke with Robert Doe, and the Does agreed that CFSA social workers, rather than police, would remove Ann, Oliver, and Sara for temporary placement. Dep. of Carla Doe at 170:2-171:22; Dep. of Robert Doe at 155:18-22.  While the Does allege that they only agreed to the removal to prevent "the police being called" and acted "under duress," Dep. of Carla Doe at 170:2-13, they did expect the arrival of the social workers on the evening of October 20, 2004, for the purposes of removing the children from the Doe home. Dep. of Carla Doe at 170:2-171:22; Dep. of Robert Doe at 155:18-22.

[22] Not only did the Twins have sexual contact with each other and with their younger siblings, but Oliver also admitted to abusing his younger sister. *See* CFSA Referral Report [Docket No. 191-8] at 12.

objection in order to provide any protection that might be reasonable is easily answered yes . . .

.").  This Court therefore grants judgment in Defendants' favor on the invasion of privacy claim.

### L.  Plaintiffs' Claim that Defendants Violated Federal and District Laws in Failing to Provide Timely and Adequate Post-Adoption Services (Count XXIII)

Plaintiffs claim that Defendants violated District and federal laws by "fail[ing] to

properly respond to . . . Plaintiffs' post-adoption needs." Am. Compl. ¶ 214.  Plaintiffs allege

that they specifically sought, but were not provided with, various post-adoption services,

including an appropriate plan for addressing the Twins' post-adoption needs through residential

or foster family placement and treatment, appropriate therapy for all Plaintiffs other than the

Twins, including family therapy, and transportation assistance.  *Id.* at ¶¶ 215, 217.  Plaintiffs,

however, have no cause of action under this Court's decision in *LaShawn A. v. Kelly*, 887 F.

Supp. 297, 298 (D.D.C. 1995), or under District law to justify such relief.

Plaintiffs first seek to hold Defendants liable for violations of *LaShawn*, alleging that

Defendants' failure to respond to their requests for post-adoption services constituted "a serious

violation of *LaShawn*, and the spirit and intent of the Implementation Plan." Am. Compl. ¶ 216.

However, *LaShawn* on its own does not provide Plaintiffs with a private cause of action.

*LaShawn* was a class action lawsuit brought on behalf of abused and neglected children in the

District of Columbia, both those in District custody and those known to the District but in private

custody.  *See id.*  In *LaShawn*, this Court found numerous and widespread problems in the

District's child welfare system and finalized a consent decree directing the then-Department of

Human Services to develop policies in various areas related to child protection and family

preservation. *Id.*  In 2003, following this Court's creation and termination of a general

receivership to address repeated deficiencies in the child welfare system, this Court approved the Court Monitor's Implementation Plan as a comprehensive outline for reform and to bring the District into compliance with the Court's 1993 Modified Final Order. *See LaShawn A. v. Fenty*, 701 F. Supp. 2d 84, 88 (D.D.C. 2010); *LaShawn* Modified Final Order [Docket No. 193-9]. Plaintiffs in the instant case argue that the *LaShawn* consent decree provides them with a cause of action against Defendants for Defendants' failure to provide adequate and timely post-adoption services.

To enforce the *LaShawn* standards, it is insufficient for Plaintiffs to simply assert that they are beneficiaries of "post-adoption services necessary to preserve families who have adopted a child." Implementation Plan at 42 [Docket No. 193-4]. As third parties to *LaShawn*, Plaintiffs bear the burden of showing that they are *intended* beneficiaries of the *LaShawn* consent decree. They have failed to do so. *See SEC v. Prudential Secs. Inc.* 136 F.3d 153, 159 ("The test is not . . . only whether the contracting parties intended to confer a benefit directly on the third parties, but also whether the parties intended the third party to be able to sue to protect that benefit."); *see also Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750 (1975) ("[A] consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it."). Plaintiffs mistakenly rely on *Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280 (D.C. Cir. 1993). In *Beckett*, the D.C. Circuit held that nonunion pilots who were third-parties to a consent decree between a union and another group of pilots could sue the union to enforce the terms of the consent decree, but only because the consent decree established a trust and named the plaintiff nonunion pilots as beneficiaries. 995 F.2d at 286-89. The *Beckett* plaintiffs were named, clearly-intended beneficiaries. Though

they rely on *Beckett*, Plaintiffs in the instant case have not offered proof that they were, in the same way, intended beneficiaries of the *LaShawn* decree.

Similarly, Plaintiffs do not identify any statutory provision that provides them with an explicit or implied cause of action against Defendants under District law.  Plaintiffs cite D.C. Code § 7-2108(d)(1), which falls under the Chapter governing Youth Residential Facilities Licensures.  This provision allows an action against the District for compliance with District law "relevant to the operation of the facility or the care of its residents."  D.C. Code § 7-2108(d)(1). Yet Plaintiffs' claims do not concern the operation of such a facility or the care of any resident, *i.e.* "a District child residing in a youth residential facility."  D.C. Code § 7-2101 (7).  At the time Defendants allegedly failed to offer post-adoption services, *i.e.* after 2004, the Doe children were not residents of a youth residential facility. This provision therefore fails to explicitly provide Plaintiffs with a right of action to proceed against Defendants for post-adoption services.

Plaintiffs also cite D.C. Code § 4-1303.01a(b)(1) and (7) and § 4-1303.03(b)(1), (4), and (9), which outline the various duties of CFSA and its Director to provide supportive services.[23] *See* Pls.' Opp. to Defs.' Mots. for J. [Docket No. 193] at 39.  Nowhere in these provisions, or in Chapter 4, which governs Child Abuse and Neglect, is there explicit text creating a right of action.

---

[23] D.C. Code provides that CFSA must "(1) Provid[e] services that prevent family dissolution or breakdown, to avoid the need for protective services or out-of-home placements . . . (7) Offer[] appropriate, adequate, and, when needed, highly specialized, diagnostic and treatment services and resources to children and families when there has been a supported finding of abuse or neglect." D.C. Code § 4-1303.01a(b)(1) and (7).  CFSA and its contractors must also:

> (1) When a child is at risk of being removed from his or her home because of child abuse or neglect, provide family preservation services designed to help the child remain safely with his or her family; . . . (4) Establish or attempt to secure priority access . . . to services necessary for the preservation or reunification of families . . . (9) Develop and operate programs of family preservation services, family support services, time-limited family reunification services, and adoption promotion and support services; . . . .

D.C. Code § 4-1303.03(b)(1), (4) (9).

Further, Plaintiffs do not carry their burden of showing that they have an implied right of action in District law. In determining whether a statute creates an implied right of action, a court must look to three factors: "(1) whether the plaintiff is 'one of the class for whose *especial* benefit the statute was enacted'; (2) whether there is any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one; and (3) whether it is consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff." *Baumann v. District of Columbia*, 744 F. Supp. 2d 216, 226 (D.D.C. 2010) (quoting *In re D.G.*, 583 A.2d 160, 166 (D.C. 1990)). Plaintiffs offer no proof that the D.C. Council intended to imply a right of action in § 4-1303.01(b)(1) and (7) and § 4-1303.03(1), (4), and (9), or that the D.C. Council intended to extend the cause of action identified in § 7-2108(d)(1) to these provisions. Such proof is essential. *See id.* ("The ultimate issue is whether the legislature intended to create a particular cause of action, because unless such legislative intent can be inferred from the language of the statute, the statutory structure, or some other source, the Essential predicate for implication of a private remedy simply does not exist.") (internal citations omitted). Since Plaintiffs have not demonstrated that they have a right of action against Defendants for failure to provide post adequate post-adoption services, this Court awards judgment to Defendants.

### M. Claims against Defendant Fenty

This Court also enters judgment in favor of Defendant Fenty. First, claims against former Mayor Fenty in his official capacity are duplicative of the claims against the District, which is already a Defendant in this case. *See Kentucky v. Graham*, 473 U.S. 159, 167 (1985) ("There is no longer a need to bring official capacity actions against local government officials [since] local

government units can be seud directly for damages and injunctive or declaratory relief."). Second, Plaintiffs have not pled any facts showing that Defendant Fenty engaged in unlawful conduct during the investigation and removal of the Doe children. This Court therefore awards judgment to Defendant Fenty.

### N. Qualified Immunity

Defendants are also entitled to qualified immunity for their actions. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). A court engaging in a qualified immunity inquiry "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right." *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quotation omitted). If the court establishes the violation of a constitutional right, it must then "proceed to determine whether that right was clearly established at the time of the alleged violations." *Id.* (quotation omitted).

As described in detail in the analysis of Plaintiffs' Fourth and Fifth Amendment claims, Plaintiffs have failed to put forth evidence establishing a violation of their constitutional or statutory rights. Plaintiffs therefore fail to sustain their burden on the first prong of the qualified immunity inquiry. Plaintiffs also do not meet their burden on the second prong. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). This Court cannot find that "in light of pre-existing law the unlawfulness [of Defendants' conduct is] apparent." *Anderson v. Creighton*, 483 U.S.

635, 640 (1987). At the time of the removal, there was little established doctrine describing what steps State officials may legally undertake in seeking to protect children from alleged abuse. The D.C. Circuit has not yet definitively ruled on what constitutes "immediate harm" justifying the removal of a child from his home and, even in 2004, other circuits had offered conflicting standards in this regard. *Compare Tenenbaum*, 193 F.3d at 596 ("[N]ot until today have we specifically held that where there is reasonable time consistent with the safety of the child to obtain a judicial order, the 'emergency' removal of a child is unwarranted.") *with Doe v. Kearney*, 329 F.3d 1286, 1297-1298 (11th Cir. 2003) ("[T]he sole focus should not be whether there is time to obtain a court order . . . . [D]ue process [requires] subtle balancing [that] cannot be properly accomplished when courts blunt the inquiry by simply asking whether there was time to get a warrant.").

This Court concludes that it would not have been clear to Defendants at the time that their conduct was unlawful. Defendants had numerous reasons to conclude that the Doe children were in immediate danger and removal was necessary. In light of the circumstances, a reasonable officer in Defendant Donald's position would not have believed that her decision to remove the children from their home was unlawful. Similarly, Defendants Philippart and King were assigned on October 20, 2004 the task of picking up both Ann and Oliver Doe from the Doe household. This was their sole involvement in the case. When they accepted the assignment, they in good faith believed that there had been a finding of immediate danger and the removal was therefore lawful. Dep. of Rebekah Philippart at 12:7-14; 15:12-19. Accordingly, both Philippart and King are entitled to qualified immunity. The remaining individual defendants, who neither made the finding of immediate danger nor directly removed the children, are likewise entitled to qualified immunity.

## IV.    Conclusion

This Court has considered Plaintiffs' remaining arguments and has found them without merit.  While CFSA could have been more clear and detailed in articulating to Plaintiffs and in documenting in their forms their reasons for removing the children, this Court concludes that no reasonable juror could find Defendants' conduct unlawful.  Thus, for the reasons articulated in this opinion, Defendants' Motion for Judgment on the Pleadings and Motion for Summary Judgment are **granted,** Plaintiffs' Motion for Summary Judgment is **denied**, and Defendants' Motion to Strike Portions of the Declaration of Delores Williams and Motion to Strike Plaintiffs' Supplemental Memorandum in Response to Questions Raised in Oral Argument are **denied as moot.**

An appropriate order accompanies this memorandum opinion.

July 26, 2013

Thomas F. Hogan
UNITED STATES DISTRICT JUDGE