**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CARLA DOE, *et al.*,

                    Plaintiffs,

         v.

DISTRICT OF COLUMBIA, *et al.*,

                    Defendants.

Civil Action No. 05-cv-1060 (TFH)

**UNDER SEAL**

## MEMORANDUM OPINION

        This lawsuit has been litigated for nearly two decades but the sad circumstances that led

to it foretold that there could be no truly satisfying resolution for the plaintiffs.  In 2004, Robert

and Carla Doe delivered a letter to the District of Columbia's Child and Family Services Agency

(CFSA) stating that their two older adopted children, 13-year-old twins Wayne and Sara, were

sexually abusing their two younger adopted children, 6-year-old Ann and 9-year-old Oliver.

That letter triggered a series of events that ultimately led to CFSA officials removing Ann and

Oliver from their home for one day.

        Robert and Carla—on behalf of themselves and as guardians of Ann and Oliver—filed

this lawsuit alleging that the removal was illegal and advancing twenty-three constitutional and

tort claims against the District and eight of its officials.  The Court granted summary judgment in

favor of all the defendants on all the plaintiffs' claims.  As a result, the Court dismissed the

amended complaint.

        On appeal, the United States Court of Appeals for the District of Columbia Circuit ("D.C.

Circuit") affirmed the summary judgment, except with respect to the plaintiffs' claims under 42

U.S.C. § 1983 for violations of the Fourth and Fifth Amendments to the United States

Constitution.  The D.C. Circuit vacated those claims and remanded them to this Court to determine whether the District is subject to municipal liability pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

Both parties now move for summary judgment on the question of municipal liability.  It is clear to the Court that there are no villains or victors in this case.  Both sides appear to have tried to do their best to help the children involved given the difficult circumstances and their own constraints, whether personal or institutional.  There is, however, no evidence that CFSA removed Ann and Oliver pursuant to an official municipal policy that allowed children to be removed without a warrant or pre-deprivation hearing when there was no bona fide emergency.  As a result, there is no triable issue and municipal liability cannot be imputed to the District for alleged violations of the Fourth and Fifth Amendments that the plaintiffs claim occurred as a result of Ann's and Oliver's one-day removal.  The Court therefore will grant the District's motion for summary judgment and deny the motion for summary judgment filed by Carla, Robert, Ann, and Oliver.

## BACKGROUND

The undisputed facts show that Robert and Carla Doe were foster parents for several years before adopting four children.  *See* Def's Resp. to Pls.' Statement of Material Facts ¶ 1 [ECF No. 250-1].[1]  Robert and Carla first adopted Ann and Oliver and later adopted older twins Wayne and Sara.  *Id.*

---

[1] Motions for summary judgment have been entertained twice in this case—once before appeal and once after remand.  As a result, certain facts and evidence were presented during the pre-appeal motions briefing while others were presented during the post-remand briefing.  To avoid confusion about similarly titled documents from each of these stages of the litigation, every full document cite will include the docket number.

Unbeknownst to Robert and Carla, Wayne and Sara began sexually abusing Ann and Oliver almost immediately after joining the family.  *Id.* ¶ 2; Defs.' Mot. for Summ. J. Exs. A 86:1–92:22 (Carla Doe Dep.), B 8:1–22 (Ann Doe Dep.), C 25:6–11 (Oliver Doe Dep.) [ECF Nos. 191 through 191-2 (SEALED)].  The abuse continued for about four years until Sara revealed it to Carla in 2004.  Def's Resp. to Pls.' Statement of Material Facts ¶ 2 [ECF No. 250-1]; Defs.' Mot. for Summ. J. Ex. A (Carla Doe Dep.) 86:1–89:12 [ECF No. 191 (SEALED)].

Robert and Carla notified CFSA officials about their children's sexual abuse on September 27, 2004, via a letter delivered to Brenda Donald, who was then CFSA's Acting Director,[2] and Sharon Knight, who was CFSA's Program Manager for Adoption Services.  Def's Resp. to Pls.' Statement of Material Facts ¶ 3 [ECF No. 250-1]; Pls.' Mot. for Partial Summ. J. Ex. 3 at 1 [ECF No. 188-2 (SEALED)].  The letter disclosed that Wayne and Sara had been molesting Ann and Oliver and sought help from CFSA to address the family's situation.  Pls.' Mot. for Partial Summ. J. Ex. 3 at 1, 3–4 [ECF No. 188-2].

At that point in time, Wayne had been moved to a therapeutic-respite home.  *Id.*  Sara, however, remained at home with Ann and Oliver.  *Id.*  Robert and Carla asserted that Sara needed to be placed in a therapeutic-respite home "immediately."  *Id.*

Robert and Carla also revealed that their financial situation was "dire."  *Id.*  They reported that they had "fallen behind financially," they had no savings or retirement funds, and the money they had received from the Crime Victim's Fund was expected to "run out shortly, or may not fully cover . . . services" that both Wayne and Sara needed.  *Id.*  They said that they "ha[d] no funds of [their] own to even attempt to undertake what is necessary to determine *if*

---

[2] Director Donald left CFSA in 2015 but returned in 2017.  *See* Child & Family Servs. Agency, DC.gov (July 10, 2019), https://cfsa.dc.gov/biography/brenda-donald.  She currently serves as CFSA's Director.  *Id.*

[the] family [could] be preserved." *Id.* They further stated that the "intensity of the issues"

stemming from Wayne's and Sara's adoption hindered their ability to work away from home. *Id.*

Notably, Robert and Carla said that they were "no longer able to continue parenting . . .

four children with such significant needs." *Id.* They therefore urged the CFSA officials to

provide "*immediate* financial and other support" and a meeting to "discuss [their] situation and

make arrangements for financial and other assistance." *Id.* at 4 (emphasis in original).

Over the course of the next ten days, CFSA officials met with Robert and two of the

children's therapists, had at least three internal meetings to develop a plan to address Wayne's

and Sara's placements, reported the sexual abuse to CFSA's hotline, and assigned an

investigative social worker to assess the children's safety. Pls.' Statement of Material Facts Not

Genuinely at Issue ¶ 5 [ECF No. 249-2][3]; Pls.' Statement of Genuine Issues ¶ 22 [ECF No. 193-

1]; Defs.' Statement of Material Facts ¶¶ 22, 24, 27 [ECF No. 186]. Director Donald testified

during a deposition that CFSA typically only provided post adoption services for the first six

months to a year after an adoption but, notwithstanding that it had been "several years" after the

Doe children's adoptions, "we had stepped in to help them out before in response to their request

and we were trying to . . . see if we could provide the kind of support that they requested."

Defs.' Mot. for Summ. J. Ex. M 35:10–18 [ECF No. 191-12 (Sealed)]. The plaintiffs concede

that CFSA "negotiated with the Does for a few weeks" after receiving Robert's September letter.

Pls.' Reply Br. 17 [ECF No. 253].

On October 7, 2004, the assigned CFSA social worker, Delores Williams, concluded that

Robert and Carla had an adequate safety plan in place given that they had installed alarms on

---

[3] The District challenged this fact, and others, on the ground of relevancy but not accuracy. *See*
Def.'s Resp. to Pls.' Statement of Material Facts ¶ 5 [ECF No. 250-1].

Ann's and Oliver's bedroom doors, both Wayne and Sara[4] were no longer living at the family's home, and the children were subject to greater supervision.  Pls.' Reply Br. in Support of Mot. for Partial Summ. J. Ex. 71 ¶ 7 (Williams Decl.) [ECF No. 199-1].  The social worker was unaware, however, that two days earlier Robert had notified CFSA officials by letter that he and Carla were no longer able to afford Wayne's therapeutic-respite home and Carla's mother could not continue to house Sara.  Defs.' Mot. for Summ. J. Ex. H at 1 [ECF No. 191-7 (SEALED)].

Indeed, Robert sent CFSA a letter dated October 4, 2004[5] that characterized the family's situation as a "crisis."  *Id.*  Robert stated that funds to pay for Wayne's respite care were "exhausted," CFSA needed to pay for Wayne's therapeutic-respite services or make "immediate plans" to transition him to a new home, and Sara needed to be transitioned to a new home "[a]s soon as possible this week."  *Id.*  The obvious implication was that Robert and Carla no longer had the financial means or family resources to maintain Wayne's and Sara's housing situations, so the twins were at imminent risk of returning to the family's home.

Moreover, CFSA's knowledge about the scope of the Doe children's sexual abuse appears to have been evolving.  About a week after the social worker made her conclusion, the Doe children reportedly were interviewed as part of CFSA's investigation.  *See* Pls.' Mot. for Summ. J. Ex. 17 at 2 [ECF No. 188-16 (Sealed)] (CFSA Child Abuse & Neglect Complaint Referral Form).  During that interview "it was disclosed that all of the children have been involved with sexual activity with each other for a length of time."  *Id.*  In other words, the scope

---

[4] At that time Sara was living with Carla's mother.  *See* Def's Response to Pls.' Statement of Material Facts ¶ 4 [ECF No. 250-1] (stating that Sara was moved to her maternal grandmother's home after the sexual abuse was revealed).

[5] CFSA marked the letter as received on October 5, 2004.  *Id.*

of sexual abuse was not limited to acts Wayne and Sara perpetrated on Ann and Oliver but also included sexual acts that Ann and Oliver perpetrated on each other. *Id.*

At some point during this time CFSA officials held a teleconference with Robert to discuss a proposed plan to help the family, which included Robert and Carla entering into a voluntary agreement to place Wayne and Sara in a therapeutic foster home while a sexual-abuse investigation was completed. Defs.' Mot. for Summ. J. Ex. L 1–2 [ECF No. 191-11 (Sealed)]. Robert and Carla rejected CFSA's proposal in an October 14, 2004 letter that asserted, among other things, that CFSA's plan was contrary to recommendations the children's therapists made and any change to Wayne's and Sara's therapists would be detrimental. *Id.* at 3.

Finally, on October 19, 2004, two CFSA officials "called Robert and Carla to request they place Ann, Oliver, Wayne and Sara into voluntary foster care while an investigation was completed." Pls.' Statement of Material Facts Not Genuinely at Issue ¶ 10 [ECF No. 249-2]. The following day, after Robert's and Carla's attorney discussed the matter with CFSA officials to no avail, and the parties appeared to be at an impasse, Director Donald decided that Ann and Oliver should be removed from their home. *Id.* ¶¶ 10–15. Ann and Oliver were removed that evening, October 20, 2004, taken to a hospital for physical examinations, and then Ann was taken to her grandmother's home, Oliver was taken to a temporary foster home, and Sara was taken from Carla's mother's home to a separate temporary foster home. *Compare* Pls.' Statement of Material Facts Not Genuinely at Issue ¶¶ 18, 22, 24 [ECF No. 249-2], *with* Def.'s Response to Pls.' Statement of Material Facts ¶¶ 18, 22, 24 [ECF No. 250-1][6]. Robert and Carla

---

[6] Although the District disputed parts of the plaintiffs' statements of fact numbered 18, 22, and 24 on other grounds, it did not challenge the accuracy of the facts that are cited herein. *See* Def.'s Response to Pls.' Statement of Material Facts ¶¶ 18, 22, 24 [ECF No. 250-1].

were given notice to appear the next day for a hearing at the District of Columbia Superior Court. Pls.' Mot. for Partial Summ. J. Ex. 13 [ECF No. 188-12 (Sealed)].

On October 21, 2004, CFSA Child Abuse & Neglect Complaint Referral Forms were submitted alleging sexual abuse of Ann, Oliver, Wayne, and Sara. *See id.* Ex. 17 [ECF No. 188-16 (Sealed)]. The complaints stated, among other things, that "[i]n a CAC interview conducted with the children last week, it was disclosed that all of the children have been involved with sexual activity with each other for a length of time" and "[d]ue to this disclosure, on 10/20/04, the children were removed from the home and brought into the custody of Child and Family Services Agency." *Id.* at 2 of 9. The complaints were withdrawn, however, by the Assistant Attorney General representing the District. Def.'s Response to Pls.' Statement of Material Facts ¶ 27 [ECF No. 250-1] (offering no contest to the accuracy of this fact, albeit asserting that the paragraph contains hearsay). Oliver and Ann were returned to their home later that day. *Compare* Pls.' Statement of Material Facts Not Genuinely at Issue ¶ 28 [ECF No. 249-2], *with* Def.'s Response to Pls.' Statement of Material Facts ¶ 28 [ECF No. 250-1].

On May 27, 2005, the plaintiffs filed a complaint that was subsequently amended on December 14, 2007. *See* Compl. [ECF No. 3]; First Am. Compl. [ECF No. 30]. On January 15, 2008, the defendants moved to dismiss or for summary judgment. *See* Defs.' Mot. to Dismiss or for Summ J. [ECF No. 32].

Two months later, the Court heard arguments and issued a bench ruling granting in part and denying in part the defendants' motion. That bench ruling was memorialized in an order the Court issued on March 7, 2008. Order Denying in part Mot. to Dismiss Mar. 12, 2008 [ECF No. 37]. The Court dismissed four claims that were based on an alleged violation of the plaintiffs' substantive due process rights, two claims that were premised on equal protection violations, two

claims that alleged that the plaintiffs' Ninth Amendment rights were violated, two claims that alleged a conspiracy, the plaintiffs' request for punitive damages, and one plaintiff.  *Id.*

For the next four-and-a-half years, the parties engaged in contested discovery about liability.  *See* ECF Nos. 41–174.  During that time, the case was referred to then-Magistrate Judge Alan Kay to oversee discovery and resolve the disputes.  *See* Minute Order Dec. 19, 2008 (referring case pursuant to LCvR 72.2(a)).  On September 12, 2012, the parties notified the Court that they had completed liability discovery and were ready to proceed with dispositive motions. *See* Joint Mot. for a Scheduling Order at 1 [ECF No. 175].

Both parties filed motions for summary judgment on November 8, 2012.  *See* Pls.' Mot. for Partial Summ. J. [ECF No. 182]; Defs.' Mot. for J. on the Pleadings & Mot. for Summ. J. [ECF No. 186].  After oral arguments, the Court issued a memorandum opinion and order granting summary judgment in favor of the defendants and dismissing the First Amended Complaint.  Mem. Op. Aug. 1, 2013) [ECF No. 208]; Order Granting Defs.' Mot. for Summ. J. Aug. 1, 2013 [ECF No. 209].  The plaintiffs noticed an appeal on September 3, 2013.  Notice of Appeal [ECF No. 211].

On August 11, 2015, the D.C. Circuit affirmed the dismissal of the plaintiffs' First Amendment claims, tort claims, and a claim that the District failed to provide post-adoption services and support required by the Modified Final Order that was entered in *LaShawn A. ex rel. Moore*, No. 89-1754.  *See Doe v. District of Columbia*, 796 F.3d 96, 109 (D.C. Cir. 2015).  The D.C. Circuit vacated, however, the dismissal of the Fourth and Fifth Amendment claims and remanded them to this Court to determine whether the District is subject to municipal liability under *Monell*.  *Id.*

As guidance, the D.C. Circuit stated that, "[t]o hold the District liable, the Does must show (1) a Constitutional violation, and (2) that the District was responsible for that violation." *Doe*, 796 F.3d at 105.  Bypassing the first-prong question of whether a Constitutional violation actually occurred, the D.C. Circuit directed this Court to focus on the second prong and address whether the District is liable for any Constitutional violation under *Monell*.  *Id.*  The D.C. Circuit noted that "if District policy allows for the warrantless removal of children when there is no bona fide emergency, then the District would be responsible for any constitutional violation that may have occurred here."[7]  *Id.*  The D.C. Circuit stressed, however, that "if the Doe children were not removed pursuant to a custom or policy of the District, then the § 1983 claim fails."  *Id.*

## LEGAL STANDARDS

### I.   Summary Judgment Pursuant to Rule 56 of the Federal Rules of Civil Procedure

Rule 56 of the Federal Rules of Civil Procedure mandates that the Court grant summary judgment in favor of a moving party when there are no genuine disputes about material facts and judgment as a matter of law is warranted.  Fed. R. Civ. P. 56(a).  A dispute is genuine if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Id.*

---

[7] Distinguishing between the legal standards that apply to a Fourth Amendment violation versus a Fifth Amendment violation, the D.C. Circuit noted that "[u]nder the Fourth Amendment a warrant or a pre-removal hearing is not required when the government acts in response to an exigency," whereas the Fifth Amendment requires due process before parents can be deprived of their child's custody, which usually comes in the form of a pre-deprivation hearing, although "extraordinary situations where some valid governmental interest is at stake, such as the health and welfare of children, may justify postponing the hearing until after the event."  *Doe*, 796 F.3d at 103 (internal quotation marks omitted).  The D.C. Circuit went on to treat both the Fourth and Fifth Amendments as requiring a "bona fide emergency" in order for the District to avoid municipal liability for the warrantless removal of children.  *Id.* at 105.

The party moving for summary judgment bears the burden of showing that there are no genuine disputes about material facts. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). To determine whether there is a genuine dispute about a material fact, the Court must view the evidence in the light that is most favorable to the party opposing the motion, *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *id.* at 651. The Court may not weigh the evidence or make credibility determinations. *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015).

To successfully oppose a motion for summary judgment, the nonmoving party must offer sufficient evidence of a factual dispute—not mere allegations—such that a jury or judge is necessary "to resolve the parties' differing versions of the truth at trial." *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968). Although the evidence need not be "in a *form* that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence." *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 969 (D.C. Cir. 2016) (emphasis in original) (quoting *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphases in original).

## II.     Municipal Liability Under 42 U.S.C. § 1983

The principal legal question in this case is whether the District is subject to municipal liability under 42 U.S.C. § 1983. 42 U.S.C. § 1983 is a federal statute that authorizes a plaintiff to file a civil action when another person who is acting under color of law deprives the plaintiff of constitutional or legal rights, privileges, or immunities. *Monell*, 436 U.S. at 691–92.

Municipalities are liable under § 1983 only when their officials injure a plaintiff while acting pursuant to an "official municipal policy."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011); *Monell*, 436 U.S. at 691.  This requirement ensures that municipalities are not held liable solely because they employ someone who commits wrongdoing.  *Monell*, 436 U.S. at 691.  "[I]in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Id.* "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." [8]  *Id.* at 694. Accordingly, municipalities "should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) (plurality opinion).

Plaintiffs bear the burden of identifying the official municipal policy or custom that caused their injuries.  *See Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 403 (1997) (stating that "we have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury"); *Los Angeles Cty., Cal. v. Humphries*, 562 U.S. 29, 30–31 (2010) ("In *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978), this Court held that civil rights plaintiffs suing a municipal entity under 42 U.S.C. § 1983 must show that their injury was caused by a municipal policy or custom.").  The United States Supreme Court has defined "official municipal policy" to include "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Connick*, 563 U.S. at 61.

---

[8] "*Monell's* rejection of *respondeat superior*, and its insistence that local governments could be held liable only for the results of unconstitutional governmental 'policies,' arose from the language and history of § 1983."  *Praprotnik*, 485 U.S. at 122.

There are several ways plaintiffs can satisfy their burden.  First, plaintiffs can establish that "the municipality or one of its policymakers explicitly adopted the policy that was the moving force of the constitutional violation."  *Warren v. D.C.*, 353 F.3d 36, 39 (D.C. Cir. 2004) (internal quotation marks omitted).  Second, the requisite showing can be made when "a policymaker . . . knowingly ignore[d] a practice that was consistent enough to constitute custom."  *Id.*  Third, a municipality's failure to respond to a need might have been committed "in such a manner as to show deliberate indifference to the risk that not addressing the need will result in constitutional violations."  *Id.* (quotation marks omitted).

To be sure, there are occasions when isolated decisions by municipal officials and employees qualify as official municipal policy.  *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (plurality opinion) (noting that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances").  In *Pembaur*, the United States Supreme Court explained that, "where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly."  475 U.S. at 481; *accord Doe*, 796 F.3d at 105 (noting that proof of a single incident of unconstitutional activity might trigger *Monell* liability if "proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy" (quoting *City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985)).  Thus, "the alleged adverse action need not be part of a pattern because municipal liability may be imposed for a single decision by municipal policymakers."  *Paige v. Coyner*, 614 F.3d 273, 284 (6th Cir. 2010) (internal quotation marks omitted).

Municipal liability for an official's singular decision attaches, however, only when "a deliberate choice to follow a course of action is made from among various alternatives" and the

official is "responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483. As *Pembaur* makes clear, municipal liability for an official's singular decision is limited to occasions when that official "possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 481; *accord Praprotnik*, 485 U.S. at 123 (stating that "an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business"). Liability will not attach simply because "a particular official—even a policymaking official—has discretion in the exercise of particular functions." *Pembaur* at 482. To the contrary, "[t]he official must also be responsible for establishing final government policy respecting such activity . . . ." *Id.* at 482–83. "If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be . . . *respondeat superior* liability, which *Monell* had rejected." *Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997) (internal quotation marks omitted).

Relying on *Pembaur*, courts have been careful to distinguish between "the authority to make final *policy* with the authority to make final implementing *decisions*." *Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 966 (4th Cir. 1995) (emphases in original); *accord Bolderson v. City of Wentzville, Mo.*, 840 F.3d 982, 985 (8th Cir. 2016) (stating that "we have adopted the distinction between final policymakers and final decisionmakers that a Supreme Court plurality drew in *Pembaur*"); *Miller v. Calhoun Cty.*, 408 F.3d 803, 814 (6th Cir. 2005) (stating that the plaintiff "conflates decisionmaking with policymaking"). As the Fourth Circuit has observed, "[m]unicipal liability . . . depends on whether the liability asserted is based on a municipal act and not simply on the independent act of a municipal employee, even though that employee may be acting as the final decisionmaker."

13

*Greensboro Prof'l Fire Fighters Ass'n, Local 3157*, 64 F.3d at 964–65.  Thus, even when a municipal actor serves at the highest echelon of an agency's leadership—and therefore is a final decision maker—that does not by default mean the municipal actor is making final policy versus a final decision that implements policy made by superior policymakers:

> Any city acts exclusively through agents; the city is just a name for a complex of persons. If it were enough to point to the agent whose act was the final one in a particular case, we would have vicarious liability. Action in the course of one's duty is the basis of vicarious liability. That a particular agent is the apex of a bureaucracy makes the decision "final" but does not forge a link between "finality" and "policy". The President, a cabinet officer, or his delegate makes the final decision in the implementation of the laws without changing the fact that the President executes rather than makes law. One may doubt the footing of *Monell*, but that decision is not to be sabotaged by calling the chief bureaucrat who signs off on a particular action the city's "policymaker" for that action.

*Auriemma v. Rice*, 957 F.2d 397, 400 (7th Cir. 1992) (internal citation omitted).  The dichotomy between acts that *make* policy versus decisions that *implement* policy has been described as "entail[ing] distinguishing legislative from executive functions—a distinction always present in principle even though blurry in practice."  *Id.* at 401.

Furthermore, "[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality."  *Praprotnik*, 485 U.S. at 127.  "The authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final, unreviewable, and are not constrained by the official policies of superior officials."  *Waters v. City of Morristown, TN*, 242 F.3d 353, 362 (6th Cir. 2001).  "[I]f a final decision does not implement municipal policy, or is contrary to it, then it is not imputable to the municipality."  *Greensboro Prof'l Fire Fighters Ass'n, Local 3157*, 64 F.3d at 965.  Stated more simply, departures from official municipal policy are not municipal acts for the purposes of § 1983.  *Singletary v. D.C.*, 766 F.3d 66, 74 (D.C. Cir. 2014).

Identifying whether an official has authority to establish final policy is a question of state law. *Praprotnik*, 485 U.S. at 124. The applicable law includes "state and local positive law, as well as custom or usage having the force of law." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (quotation marks omitted). While more than one official or body might be authorized to establish the relevant final policies, "a federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *Id.* at 126.

Policy-making authority "may be granted directly by a legislative enactment or may be delegated by an official who possesses" it. *Pembaur*, 475 U.S. at 483. It may be "express, as by a formal job-description, or implied from a continued course of knowing acquiescence by the governing body in the exercise of policymaking authority by an agency or official." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (internal citations omitted).

The Court's "understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under [the] relevant state law." *McMillian v. Monroe Cty., Ala.*, 520 U.S. 781, 786 (1997). Ultimately, the Court's "task is to 'identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.'" *Id.* at 784–85 (quoting *Jett*, 491 U.S. at 737).

## ANALYSIS

The plaintiffs advance two alternate theories to support their claims that the District is subject to municipal liability for violations of the Fourth and Fifth Amendments that occurred when CFSA officials removed Ann and Oliver from their home for one day. *See* Pls.' Reply Br. 1 [ECF No. 253]. They first argue that the District is liable because CFSA Director Brenda

15

Donald was a final policymaker when she made the decision to remove Ann and Oliver without a court order to do so and without a pre-deprivation hearing.  Pls.' Reply Br. 3.  The plaintiffs next argue that municipal liability attaches to the District because, when Ann and Oliver were removed, the District "adopted" an unlawful and "explicit policy of removing children first, and pursuing a court hearing second."  Pls.' Reply Br. 7.  Neither theory is sound when evaluated in light of the applicable law and the particular circumstances of this case.

I.     **CFSA Acting Director Brenda Donald was not a Final Policymaker with the Authority to Establish a Municipal Policy Permitting Warrantless Removals Absent a Bona Fide Emergency**

The plaintiffs first contend that municipal liability attaches to the District because Director Donald "made the decision to remove the Doe children without first obtaining a court order" and "was at the time a policymaker as established by District law."  Pls.' Reply Br. 3 [ECF No. 253].  They further contend that Director Donald's final policymaking authority is evidenced by District law, namely D.C. Code § 4-1303.03(a)(a-1) and a CFSA policy manual.[9] Pls.' Opp'n Br. 17 [ECF No. 251]; Pls.' Reply Br. 3–4 [ECF No. 253].

The plaintiffs agree, however—as they must in light of the Supreme Court's decision in *Pembaur*—that the District is liable for Director Donald's removal decision only if she was a policymaker who had final authority to establish municipal policy with respect to the action ordered.  *See* Pl.'s Reply Br. 5 [ECF No. 253] (quoting *Pembaur*, 475 U.S. at 481, 483).  The challenged action that was ordered in this case was Ann's and Oliver's removal from their home without a court order or pre-deprivation hearing.  *See* Pls.' Opp'n Br. 2.  Accordingly, consistent

---

[9] The plaintiffs initially argued in their motion for summary judgment that the District's answers to interrogatories and Director Donald's deposition testimony also evidence the requisite final policymaking authority, but they appear to have abandoned that argument in their reply brief. *Compare* Pls.' Opp'n Br. 17 [ECF No. 251], *with* Pls.' Reply Br. 3–4 [ECF No. 253].

with the D.C. Circuit's framing, the question is whether Director Donald was a policymaker with final authority to establish policy that "allows for the warrantless removal of children when there is no bona fide emergency." *Doe*, 796 F.3d at 105. She was not.

The Court must look to applicable "state" law—i.e., District of Columbia law—to determine whether Director Donald was a policymaker with final authority to establish policy that allows for the warrantless removal of children when there is no bona fide emergency. *See Jett*, 491 U.S. at 737. District law is set forth in the Code of the District of Columbia (D.C. Code), which vests in the city's elected Council the legislative authority and the authority to "define the powers, duties, and responsibilities of any . . . office, agency, department, or instrumentality" the Council creates. D.C. Code §§ 1-204.01(a), 1-204.04(a)–(b). The Council created CFSA as an executive agency subordinate to the District's mayor and set forth the powers of CFSA's Director. *See* D.C. Code §§ 1-204.22, 4-1303.01a(a), 4-1303.03.

The D.C. Code section that enumerates the CFSA Director's powers and authority does not expressly authorize the CFSA Director to engage in policymaking. *See* D.C. Code § 4-1303.03. As a matter of fact, the term "policy" appears nowhere in that section of the statute. *Id.* That said, the District does not dispute that the CFSA Director was a policymaker, *see* Def.'s Response to Pls.' Statement of Material Facts ¶ 16 [ECF No. 250-1], and policymaking authority arguably is implied in various of the Director's duties and powers, although the Court need not reach the question of which ones because the D.C. Code expressly prescribes the scope of the CFSA Director's authority to remove children without a warrant, which is the only policymaking authority at issue in this case.

The D.C. Code states that the Director has the power to "take into custody and place in shelter care, in accordance with subchapter I of Chapter 23 of Title 16, children who have been

abused or neglected."  D.C. Code § 4-1303.03(a-1)(1).  Accordingly, the scope of the CFSA

Director's authority to make a policy that allows children to be removed without a warrant is

subject to subchapter I of Chapter 23 of Title 16 of the D.C. Code.  *Id.*

       Subchapter I of Chapter 23 of Title 16 of the D.C. Code was enacted by the city's

Council and provides in relevant part that "[a] child may be taken into custody . . . by any

employee of [CFSA] authorized to do so . . . when he or she has reasonable grounds to believe

that the child is in immediate danger from his or her surroundings and that the removal of the

child from his or her surroundings is necessary."  D.C. Code § 16-2309(a)(3).[10]  Subchapter I of

Chapter 23 of Title 16 thereby serves as a check on the CFSA Director's authority to remove a

child without a warrant by limiting that authority to circumstances in which a child is in

immediate danger from his or her surroundings—i.e. when there is a bona fide emergency.  *Id.*

       As a result, the CFSA Director's authority to remove a child without a warrant is

"constrained by policies not of [her] making, and [her] decision to depart from those policies," if

such a departure occurred, "was not an act of the municipality for purposes of § 1983."

*Singletary*, 766 F.3d at 74 (quoting *Praprotnik*, 485 U.S. at 127 (alteration adopted)).  As already

stated, "[t]he authority to exercise discretion while performing particular functions does not

make a municipal employee a final policymaker unless the official's decisions . . . are not

---

[10] Subchapter I of Chapter 23 of Title 16 also permits an authorized CFSA employee to take a
child into custody when the employee has reasonable grounds to believe that the child is
"suffering from illness or injury or otherwise endangered and . . . the child's removal from his or
her surroundings is necessary."  D.C. Code § 16-2309(a)(4).  By its plain terms, this provision
appears to cover situations in which something other than a child's surroundings is the cause of
the danger (cited examples being illness or injury) but removing the child from his or her
surroundings nevertheless is reasonably necessary.  Because this provision is not relevant to the
case at hand, which involved children in immediate danger from their surroundings, there is no
need for the Court to consider it or to comment about whether it allows warrantless removals
when there is no bona fide emergency.

constrained by the official policies of superior officials." *Waters*, 242 F.3d at 362.  Here, though, the CFSA Director's decisions were constrained by the official policies of the city's Council. *See* D.C. Code § 16-2309(a)(3).

The plaintiffs pointed to an internal CFSA policy manual titled "Intake and Investigation Services" as evidence that the CFSA Director "has the authority and does adopt policy for the agency regarding removal of children."  Pls.' Reply Br. 4–5 [ECF No. 253].  The plaintiffs contend that sections of that manual that separately apply to "Hotline and Investigations" staff and "Investigations" staff prove that CFSA's Director has final policymaking authority over removals because those sections contain the same preamble of authority stating that the manual contains "policy" that the Director "adopted":

> The Director of Child and Family Services Agency adopts this policy to be consistent with the Agency's mission and applicable federal and District of Columbia laws, rules and regulations, including the federal Child Abuse Prevention and Treatment Act and its implementing regulations, provisions in Title 4 and 16 of the D.C. Code, and the modified final order and implementation plan in LaShawn A. v. Williams.

Pls.' Opp'n Br. Ex. 3, Bates Nos. DC 0109, DC 0130 [ECF No. 251-3]; *see* Pls.' Reply Br. 4 [ECF No. 253].

Although this preamble arguably indicates that the CFSA Director makes policies generally, or at least adopts them, it does not expressly or by inference intimate that the Director has "final" authority to make policies that permit the warrantless removal of children who are not in immediate danger, which is the relevant test.  *See Praprotnik*, 485 U.S. at 123 ("[T]he challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in *that area* of the city's business.").  To the contrary, the preamble makes clear that any policy set forth in the policy manual was adopted "to be consistent with . . . provisions in Title . . . 16 of the D.C. Code."  Pls.' Opp'n Br. Ex. 3, Bates

Nos. DC 0109, DC 0130 [ECF No. 251-3].  And, as already discussed, subchapter I of Chapter 23 of Title 16 of the D.C. Code confines the Director's warrantless removal authority to circumstances in which there are reasonable grounds to believe a child is in immediate danger from his or her surroundings and removal is necessary.  *See* D.C. Code § 16-2309(a)(3).

In the final analysis, it is the plaintiffs' burden "to identify a municipal policy or custom that caused [their] injury."  *Bryan Cty.*, 520 U.S. at 403.  As discussed, the plaintiffs argued that Director Donald had the authority to establish final municipal policy allowing children to be removed from their homes without a warrant or a bona fide emergency—and unlawfully exercised that authority by removing Ann and Oliver—but the evidence simply does not bear that out.  The D.C. Council expressly restricted the CFSA Director's authority to remove children by limiting that authority to circumstances in which the Director has reasonable grounds to believe the child is in immediate danger and removal is necessary.  *See* D.C. Code § 16-2309(a)(3); *see also Praprotnik*, 485 U.S. at 127 (stating that a municipality's policies constraining a subordinate official's discretionary decisions are the municipality's acts rather than the subordinate official's departures from those policies).

To the extent that Director Donald is alleged to have contravened that policy by establishing a conflicting policy that caused the plaintiffs' injuries, it is well established that a municipality is not "automatically . . . liable under § 1983 if one of its employees happened to apply the policy in an unconstitutional manner, for liability would then rest on *respondeat superior*." *City of Canton, Ohio*, 489 U.S. at 387.  "Liability for unauthorized acts is personal; to hold the municipality liable, *Monell* tells us, the agent's action must *implement* rather than *frustrate* the government's policy." *Auriemma*, 957 F.2d at 400 (emphases added).  As a result, if Director Donald's decision to remove Ann and Oliver was not based on a reasonable belief

that the children were in immediate danger and removal was necessary, liability for her act of

removing the children cannot be imputed to the District as an act of municipal policy because

Director Donald's decision would have *violated* the D.C. Council's controlling municipal policy

codified in D.C. Code §§ 16-2309(a)(3) rather than *implementing* it.  *Id.*; *accord Crowley v.

Prince George's Cty., Md.*, 890 F.2d 683, 687 (4th Cir. 1989) ("[W]e think it inappropriate to

tarnish a municipality with the errant decision of a single employee in an individual case.").

## II.     The District has No Municipal Policy, Practice, or Custom of Removing Children Without a Warrant When No Bona Fide Emergency Exists

The plaintiffs advanced the alternate theory that the District is subject to municipal

liability for violations of the Fourth and Fifth Amendments because CFSA's decision to remove

Ann and Oliver implemented an "explicit" municipal policy to remove children first and seek a

court hearing later.[11]  Pls.' Mot. for Summ. J. 20 [ECF No. 249-1].  The plaintiffs assert that this

municipal policy is expressed in Procedures U and V of the CFSA's Intake and Investigation

Services policy manual.  *Id.*  The plaintiffs' argument is not well-founded, however, because

both Procedures U and V are consistent with subchapter I of Chapter 23 of Title 16 of the D.C.

Code, which, again, is controlling municipal policy that authorizes warrantless removal only

---

[11] In the plaintiffs' brief opposing the District's motion for summary judgment they argued that "the voluminous petitions and complaints involving Agency removal of children" that the District produced during post-remand discovery "raise serious fact questions about the existence of a practice of removing children without a warrant, order, or hearing absent exigent circumstances[.]"  Pls.' Opp'n Br. 20 [ECF No. 251].  The plaintiffs failed, however, to point to any specific facts that demonstrate, whether directly or by inference, that any of the petitions actually involved a lack of exigency and, instead, offered only their own conclusory argument to that effect, which appears to be based solely on their speculation that an as yet unspecified volume of warrantless removals by default suggests a lack of exigency.  *See Branson v. Price River Coal Co.*, 853 F.2d 768, 771–72 (10th Cir. 1988) ("To avoid summary judgment, a party must produce specific facts showing that there remains a genuine issue for trial and evidence significantly probative as to any material fact claimed to be disputed." (alteration adopted and internal quotation marks omitted)).

when there is a reasonable basis to believe that a child is in immediate danger and removal is necessary.  D.C. Code § 16-2309(a)(3).

Procedure U mandates that a CFSA investigations worker shall "consider a broad range of safety-oriented responses, including those that protect a child without taking custody of the child" when a child is in "immediate or imminent danger" but "shall conduct a removal" if the investigations worker "has reasonable grounds to believe that the child is in immediate danger from his or her surroundings, or is suffering from illness or injury or is otherwise endangered, and that removal of the child from his or her surroundings is necessary."  Pls.' Opp'n to Defs.' Mot. for Summ. J. Ex. 3, Bates No. DC 0167 [ECF No. 251-3].  As is clear from this plain language, Procedure U does not advance the plaintiffs' cause because it provides for a child's warrantless removal without a pre-deprivation hearing only when there are reasonable grounds to believe that a child is in immediate danger and removal is necessary.  *See id.*  Although a CFSA official's belief that a child is in immediate danger from his or her surroundings might ultimately be proven unreasonable under the particular circumstances, that ad hoc risk does not render Procedure U an official municipal policy that allows for warrantless removal when there is no bona fide emergency.  Rather, consistent with subchapter I of Chapter 23 of Title 16 of the D.C. Code, Procedure U contemplates a child's warrantless removal without a pre-deprivation hearing only when there is immediate danger and removal is necessary.  *See id.*; D.C. Code § 16-2309(a)(3).

Procedure V addresses requirements and proceedings a CFSA investigations worker must satisfy after removing a child.  Pls.' Opp'n to Defs.' Mot. for Summ. J. Ex. 3, Bates Nos. DC 0173–75 [ECF No. 251-3].  As the District persuasively argues, however, *see* Defs.' Reply Br. 4–5 [ECF No. 252], Procedure V in no way establishes or corroborates the existence of an

official municipal policy that allows CFSA officials to remove children without a warrant or pre-deprivation hearing when there is no bona fide emergency.  In point of fact, Procedure V mandates that the investigations worker who removed a child "shall . . . petition[]" the case with the Corporation Counsel, *see* Pls.' Opp'n to Defs.' Mot. for Summ. J. Ex. 3, Bates Nos. DC 0173–75 [ECF No. 251-3], which was the prior name of the District's Office of the Attorney General, *see* Executive Branch, Gov't of D.C., Muriel Bowser, Mayor, https://mayor.dc.gov/ page/mayor-executive-branch (stating that the Office of the Attorney General was formerly called the Office of the Corporation Counsel).  Procedure V further states that, before filing the petition the investigations worker "shall have reasonable grounds to believe that the child needs to be removed because . . . the child is in immediate danger from his or her surroundings and that removal of the child from his or her surroundings is necessary . . . ."  Pls.' Opp'n to Defs.' Mot. for Summ. J. Ex. 3, Bates No. DC 0173 [ECF No. 251-3].

　　To be clear, the question is not whether the District has an official municipal policy that authorizes CFSA officials to remove a child before securing a court order or pre-deprivation hearing—it does, so long as there is a reasonable belief that the child is in immediate danger and removal is necessary.  *See* D.C. Code § 16-2309(a)(3); *Doe*, 796 F.3d at 105 ("District Code allows for the warrantless removal of children only when there is such an emergency.").  The relevant question is whether there is an official municipal policy that authorizes CFSA officials to remove a child before securing a court order or pre-deprivation hearing *when there is no bona fide emergency.  See Doe*, 796 F.3d at 105 (stating that "if District policy allows for the warrantless removal of children when there is no bona fide emergency, then the District would be responsible for any constitutional violation that may have occurred here").  The answer is "no" according to the D.C. Code, Procedure U, and Procedure V, each of which are harmonious

and contemplate that removal occurs only when there are reasonable grounds to believe that a child is in immediate danger from his or her surroundings.

Under Rule 56, the Court is compelled to grant summary judgment[12] when "the party bearing the burden of proof at trial fails to show a triable issue as to an essential element of that party's claim." *Durant v. D.C. Gov't*, 875 F.3d 685, 693 (D.C. Cir. 2017). Because the plaintiffs failed to show a triable issue regarding whether the District had an official municipal policy that allowed CFSA officials to remove children without a warrant when there was no bona fide emergency, and neither Procedures U or V constitute such a policy, the plaintiffs' motion for summary judgment must be denied and summary judgment in favor of the District must be granted.

## CONCLUSION

For the foregoing reasons the Court will grant Defendant District of Columbia's Motion for Summary Judgment [ECF No. 248] and deny Plaintiffs' Motion for Summary Judgment on Fourth and Fifth Amendment Claims [ECF No. 249]. With respect to Defendant District of Columbia's Motion for Leave to Late File Its Reply to Plaintiffs' Response to Its Statement of Material Facts as to Which There is no Genuine Dispute [ECF No. 255], the motion will be denied as moot in light of the fact that the Court resolved the motions for summary judgment without wading into the question of whether an exigency existed that satisfied the Fourth and Fifth Amendments or the corollary question of whether the CFSA Director's grounds to believe that the Doe children were in immediate danger and removal was necessary were, in fact,

---

[12] Rule 56 mandates that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

reasonable.  An order consistent with this Memorandum Opinion was separately issued on September 30, 2019.


October 17, 2019

_____
THOMAS F. HOGAN
Senior United States District Judge